A97A2497. JACKSON, STATE REVENUE COMMISSIONER
v. CITY OF COLLEGE PARK.
(496 SE2d 777)

POPE, Presiding Judge.

This complex case involves a dispute among Fulton County municipalities and the Georgia Department of Revenue regarding the proper distribution of revenues obtained from a sales and use tax imposed in the Fulton County Special Tax District. The distribution of these funds has been litigated before. See *City of Atlanta v. Collins*, 262 Ga. 261 (417 SE2d 141) (1992); *City of Roswell v. City of Atlanta*, 261 Ga. 657 (410 SE2d 28) (1991). This particular dispute arose after the Legislature amended OCGA § 48-8-89 in 1994. That statute has long required the individual governments in a special tax district to negotiate and agree to the percentages of the tax "pie" to which each government would be entitled. In 1994, the Legislature amended OCGA § 48-8-89 (b) and added a list of criteria the governments should consider when negotiating the distribution agreements. In a new subsection (d) (7), the Legislature provided that certain existing certificates would expire on December 31, 1995 and required the renegotiation of those certificates before July 1, 1995.

Pursuant to the amended statute, the governments in Fulton County entered the negotiations and, in June 1995, the county and all but one of the cities reached an agreement regarding the percentage of revenues each would receive. They filed this "certificate of distribution" with the Revenue Department on June 30, 1995. Union City's government, however, examined the most recent census data and realized it would receive a greater share of tax funds if it opted out of the agreement and chose "absent municipality" status pursuant to OCGA § 48-8-89 (b) and *City of Winder v. Collins*, 259 Ga. 570, 572 (385 SE2d 71) (1989). That authority provides that a city may choose to be treated as an "absent municipality" and receive sales tax revenues based on its population in proportion to the population of

other cities in the county.[1] Specifically, the statute states that where a city chooses "absent municipality" status, the remaining parties to the agreement "shall, in behalf of the absent municipalit[y], specify a percentage of that portion of the remaining proceeds which each such municipality shall receive, which percentage shall not be less than that proportion which [the] absent municipality's population bears to the total population of all qualified municipalities in the special district multiplied by that portion of the remaining proceeds which are received by all qualified municipalities within the special district." OCGA § 48-8-89 (b). On June 23, 1995, the Revenue Department received Union City's letter requesting this "absent municipality" status.

Although some time passed before the Revenue Commissioner could confirm the official census figures, the results did show that Union City, as an absent municipality, was entitled to a statutory minimum of 1.1689 percent of the tax revenues. This figure was .0689 percent higher than the percentage allocated in the June 1995 certificate. Under *City of Atlanta v. Collins*, 262 Ga. at 263, Union City's increase required offsets "from the tax proceeds allocated to all the [other] qualified municipalities." On January 2, 1996, the Commissioner notified the county and municipalities of the problem and stated that "in the absence of the Revenue Commissioner's receiving a new, valid distribution certificate by . . . March 4, 1996," the Revenue Department would distribute tax revenues to *all* the cities in the tax district based *only* on the proportion of each city's population to the population of all cities in the district.

The City of College Park immediately protested the Revenue Department's plan, as it completely disregarded the percentage distributions the other cities had agreed to in the June 1995 certificate. College Park suggested that the reallocation needed to increase Union City's percentage be taken from all the other cities *pro rata*. The record is unclear as to whether College Park and the remaining governments attempted to renegotiate the agreement to account for the necessary change. When the Revenue Department did not receive a new agreement, it wrote the governments on March 5, 1996, and notified them that it would impose on the governments its proposed distribution scheme.

College Park then filed this declaratory judgment action against the Commissioner, and the other cities involved were joined as parties. College Park claimed that the Revenue Department had no power to impose its own distribution scheme and that the scheme it

---

[1] *City of Winder*, 259 Ga. at 572, held that a city may choose to be treated as an absent municipality, but it did not address the central question here: who determines what percentage of revenues the absent muncipality will receive, and how is that determination made?

imposed failed to take into account any criteria other than population, in violation of the 1994 amendments to OCGA § 48-8-89 (b). Both sides moved for summary judgment. The trial court struggled to determine whether the Revenue Department had power to impose its own plan; nevertheless, it found that the Revenue Department's plan did not treat College Park fairly and granted a summary judgment which adopted College Park's "pro rata" approach.

We reverse the trial court's judgment because 1) the Revenue Department had no statutory power to impose on the county and cities its own distribution plan; and 2) the trial court, likewise, had no power to impose the distribution plan advocated by College Park. We further find that under the statutory scheme, when the Revenue Commissioner notified the municipalities of Union City's position, those governments should have renegotiated the June 1995 agreement and, if such negotiations were unsuccessful for 60 days, should have submitted their dispute to nonbinding arbitration, mediation, or other similar manner of conflict resolution.

1. In determining the merits of this case, the trial court did not specifically decide whether, when one city chooses absent municipality status, the Revenue Department has power to disregard prior negotiations and impose its own distribution formula. In fact, the trial court's order notes that "greater detail is needed in order to guide this [c]ourt as to a proper course of action." After closely examining OCGA § 48-8-89 and Supreme Court cases interpreting it, we conclude the Revenue Department has no power to impose this formula on the city governments.

First, the statute states that all distributions in the special tax district "shall be [made] in accordance with a certificate which shall be executed in behalf of each respective governing authority, except as otherwise provided in this subsection." OCGA § 48-8-89 (b). The statute provides certain criteria the governments are required to use in reaching their agreement. OCGA § 48-8-89 (b) (1)-(8). When a city chooses "absent municipality" status, the statute provides that "*the submitting political subdivisions* shall" specify a percentage share for the absent municipality, provided that share is equal to or above the statutory minimum. (Emphasis supplied.) Id. In the present case, the governments were statutorily required to *renegotiate* their agreement and *file* it with the Revenue Commissioner before July 1, 1995. OCGA § 48-8-89 (d) (7). If negotiations continued for 60 days with no agreement, the parties were required to "agree to submit the dispute to nonbinding arbitration, mediation, or such other means of resolving conflicts in a manner which, in the judgment of the commissioner, reflects a good faith effort to resolve the dispute." OCGA § 48-8-89 (d) (3). Nowhere does the statute empower the Commissioner to decree a distribution formula if the governments cannot agree;

rather, the Revenue Department's only obligation is to receive the filed agreement certificate and "distribute the proceeds of the tax in accordance with the directions of the certificate." OCGA § 48-8-89 (b). If the governments failed to submit a valid agreement by the July 1, 1995 deadline, the authority to impose the sales and use tax was to terminate on December 31, 1995. OCGA § 48-8-89 (d) (7). Compare OCGA §§ 48-8-89.2 and 48-8-89.3, which provide that the Commissioner may make specific revisions to an existing certificate when municipalities in the district cease to exist or municipalities omitted from the original certificate seek part of the tax proceeds.

The Revenue Department claims that a prior action, *City of Atlanta v. Collins* (Fulton Superior, Case No. D-90750, decided November 15, 1991), finally determined its power to declare this distribution plan when the governments failed to agree. There the superior court determined that when certain cities in the Fulton County special tax district opted out of a certificate and took "absent municipality" status, the Revenue Commissioner could declare that all cities in the tax district would be allocated revenues proportionately according to their population. We disagree, as that ruling is not binding in this case. First, that ruling has no res judicata or collateral estoppel effect. This case involves two different transactions, so res judicata does not apply. See *Cheely v. State of Ga.*, 251 Ga. 685, 687 (3) (309 SE2d 128) (1983); OCGA § 9-12-40. Moreover, the law has changed significantly since the 1991 ruling. Collateral estoppel does not apply where "a new determination is warranted to take account of an intervening change in the [law]." 46 AmJur2d, § 540. This Court will not allow a lower court ruling in a limited 1991 action to declare for all time the power of the State Revenue Department. See *Miller v. Charles*, 211 Ga. App. 386, 388-389 (3) (439 SE2d 88) (1993) (court will not apply preclusive effect where doing so would cause injustice). Second, we disagree with any contention that the Supreme Court's decision in *City of Atlanta v. Collins*, 262 Ga. at 263-264, somehow validated the superior court's 1991 ruling regarding the Commissioner's power. On the contrary, nothing in that opinion discusses this precise issue. "Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." (Citations and punctuation omitted.) *Gordy Tire Co. v. Dayton Rubber Co.*, 216 Ga. 83, 89 (1) (114 SE2d 529) (1960). See OCGA § 9-11-60 (h) (law of the case rule abolished, except that appellate decisions govern later proceedings in same case).

2. Although the trial court correctly declared that the Revenue Commissioner improperly imposed its plan on College Park and the other municipalities, it erred by ordering that the Revenue Commissioner adopt College Park's "pro rata" solution. Just as nothing in the

statute gives the Revenue Department power to impose a plan, no law allows College Park and the cities allied with its position to unilaterally impose their will on the Revenue Department and the other governments. The legislative scheme of OCGA § 48-8-89 shows clearly an intent that the governments in each tax district reach an *agreement* on the distribution of funds. The Legislature stated its "express intent" that *"eligible political subdivisions* shall analyze local service delivery responsibilities and the existing allocation of proceeds made available to such governments under the provisions of this article and make rational the allocation of such resources to meet such service delivery responsibilities." OCGA § 48-8-89 (d) (1). Voluntary agreement, not judicial decree, is the only means of producing the necessary "certificate of distribution."

If those voluntary negotiations fail, resort to the courts is not the correct remedy. OCGA § 48-8-89 (d) (3) provides that, when the governments fail to agree to a certificate of distribution within a 60-day period, they must submit their dispute to "nonbinding arbitration, mediation, or *such other means of resolving conflicts* in a manner which, in the judgment of the commissioner, reflects a good faith effort to resolve the dispute." The time-honored statutory construction rule of ejusdem generis "limits the interpretation of broad language in a series . . . to the class of the defined terms preceding it." (Emphasis omitted.) *Rice v. Huff,* 221 Ga. App. 592, 593 (1) (472 SE2d 140) (1996). Therefore, if negotiations failed, the City of College Park and the other governments were required to attempt to resolve the conflict using a type of dispute resolution which did not involve coercive relief or rule by decree or fiat — techniques such as mediation or nonbinding arbitration. The incentive to negotiate is not the threat that a judge or the Revenue Department will decide the issue; rather, if the parties reach no agreement their power to levy the tax may terminate. See OCGA § 48-8-89 (d) (7). The court-imposed remedy was, therefore, error.

We note that, had the remaining governments simply omitted from the certificate *any* portion of the tax proceeds for Union City, the Revenue Department would have followed the procedure outlined in OCGA § 48-8-89.3. That statutory procedure was, in effect, the procedure the trial court adopted in this case. As "fair" as that procedure may be, it is not applicable to this factual scenario as the statute is currently drafted.

3. We have not been asked to determine the validity of the June 1995 certificate of distribution, although we note that it was not endorsed by all municipalities and allocates Union City a percentage of revenues below the statutory minimum. Pursuant to OCGA § 48-8-89 (d) (7), were the June 1995 certificate invalid, the authority to impose the tax would have terminated on December 31, 1995. Under

the circumstances, we offer no opinion on that issue. The superior court's judgment is reversed, and this case is remanded with direction that the court require the municipalities within the Fulton County Special Tax District to engage in appropriate dispute resolution procedures as required by OCGA § 48-8-89 (d) (3).

*Judgment reversed. Johnson and Blackburn, JJ., concur.*

DECIDED FEBRUARY 6, 1998.

*Thurbert E. Baker, Attorney General, Daniel M. Formby, Deputy Attorney General, Warren R. Calvert, David A. Runnion, Senior Assistant Attorneys General, Harold D. Melton, Assistant Attorney General*, for appellant.

*Glaze, Glaze & Fincher, George E. Glaze, Laurel E. Henderson, Theodore P. Meeker III*, for appellee.