IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
February 2000 Session

## STATE OF TENNESSEE EX REL. THOMAS MATTHEW CIHLAR, ET AL. v. RONALD SHANE CRAWFORD, ET AL.

Appeal from the Davidson County Juvenile Court
No. 9819-43323   Betty Adams Green, Judge

---

No. M1999-00517-COA-R3-CV - Filed August 22, 2000

---

This appeal involves Thomas Matthew Cihlar's second attempt to obtain a judicial declaration that he is the father of a child whose mother was married to another man when the child was born. His first effort ended when the Tennessee Supreme Court held that he did not have standing to legitimate the child under Tennessee's now-repealed legitimation statutes. *See Evans v. Steelman*, 970 S.W.2d 431 (Tenn. 1998). Thereafter, the State of Tennessee, joined later by both Mr. Cihlar and his child, filed a petition in the Davidson County Juvenile Court seeking to establish Mr. Cihlar's parentage under statutes enacted after Mr. Cihlar filed his first legitimation petition. Following a bench trial, a juvenile court referee determined that Mr. Cihlar was the child's biological father, ordered Mr. Cihlar to begin making child support payments, and prescribed Mr. Cihlar's visitation privileges. The juvenile court judge later affirmed the referee's order. On this appeal, the estranged husband of the child's biological mother asserts that Mr. Cihlar's petition to establish parentage was foreclosed by *Evans v. Steelman*. We have determined that the current parentage statutes are constitutional and that they authorize not only Mr. Cihlar, but also the State and Mr. Cihlar's child, to file an action to establish Mr. Cihlar's paternity. Accordingly, we affirm the juvenile court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

WILLIAM C. KOCH, JR., J., delivered the opinion of the court, in which WILLIAM B. CAIN and PATRICIA J. COTTRELL, JJ., joined.

Ronald Shane Crawford, Joelton, Tennessee, Pro Se.

Paul G. Summers, Attorney General and Reporter, and Stuart Wilson-Patton, Assistant Attorney General, for the appellee, State of Tennessee.

Wayne Detring, Hendersonville, Tennessee, for the appellee, Thomas Matthew Cihlar.

Nannette Clark, Nashville, Tennessee, Guardian Ad Litem for Sean Michael Crawford.

### OPINION

Mary Ann Crawford and Ronald Shane Crawford were married on July 2, 1988, after she gave birth to Mr. Crawford's child. They separated in the autumn of 1990. Within a matter of weeks, Ms. Crawford, who was working as a topless dancer at the time, moved in with Thomas Matthew Cihlar whom she had met shortly after leaving Mr. Crawford. This liaison ended in April 1991 when Ms. Crawford left Mr. Cihlar and moved in with her mother. In parting, Ms. Crawford told Mr. Cihlar for the first time that she was married and also assured him that she was not pregnant. She proved to be mistaken about the latter. In August 1991, she told Mr. Cihlar that she was pregnant with his child. Ms. Crawford and Mr. Cihlar shopped for baby clothes and even agreed upon the child's name. Sean Michael Crawford was born on November 29, 1991.[1]

Ms. Crawford permitted Mr. Cihlar to develop a personal relationship with his son soon after Sean's birth. She allowed regular overnight visits on most weekends and accepted Mr. Cihlar's voluntary financial contributions for Sean's support. Mr. Cihlar's liberal access to his son continued even after Ms. Crawford began seeing Mr. Crawford again in February 1992. Mr. Crawford apparently knew that he was not Sean's father and did not object to the developing relationship between Mr. Cihlar and Sean or to Mr. Cihlar's regular financial contributions for Sean's support. The record contains little information regarding the relationship between Mr. Crawford and Sean, and there is certainly no evidence that Mr. Crawford maintained any sort of relationship with Sean after he and Ms. Crawford separated for the second, and apparently final, time in September 1993.[2]

The relationship between Ms. Crawford and Mr. Cihlar deteriorated markedly after July 1994 when Mr. Cihlar filed a petition in the Circuit Court for Davidson County to legitimate Sean pursuant to Tenn. Code Ann. § 36-2-202 (repealed 1997). Ms. Crawford opposed the petition and ended Mr. Cihlar's visitation with his son. Mr. Crawford, even though estranged from Ms. Crawford, also opposed the petition. On October 27, 1995, following a bench trial, the circuit court entered an order declaring Mr. Cihlar to be Sean Crawford's biological father and changing the child's surname to Cihlar. The trial court also ordered Mr. Cihlar to pay child support and established a regular visitation schedule with Sean. The Crawfords appealed. On October 18, 1996, this court reversed the trial court on two grounds. First, the court held that the legitimation statutes did not give Mr. Cihlar standing to legitimate his son. Second, the court concluded that Mr. Cihlar could not proceed with his legitimation petition because Ms. Crawford had not consented to it. *See In re Crawford*, No. 01A01-9602-CV-00070, 1996 WL 596953, at *4 (Tenn. Ct. App. Oct. 18, 996).[3]

---

[1] There is no question regarding who Sean's biological parents are. Genetic tests have confirmed that Mr. Cihlar, not Mr. Crawford, is Sean's biological father.

[2] As far as this record shows, the Crawfords remain separated with no thought of reuniting or of obtaining a divorce. Ms. Crawford was in a relationship with another man by the time this case reached the Circuit Court.

[3] Tenn. Code Ann. § 36-2-202(c) (repealed 1997) required maternal consent before a putative father could file a legitimation petition. However, four months before the court handed down its opinion in Mr. Cihlar's case, another panel of the court invalidated this maternal consent requirement on constitutional grounds after the Attorney General and Reporter conceded that it deprived prospective fathers of due process. *See In re Hood*, 930 S.W.2d 575 (Tenn. Ct.

(continued...)

The Tennessee Supreme Court granted permission to appeal and consolidated the case with another one raising the same issues.[4]

While these two cases were pending before the Tennessee Supreme Court, the General Assembly repealed both the paternity statutes[5] and the legitimation statutes[6] and replaced them with a single cause of action for establishing the parentage of a child.[7] This Act, which became effective on July 1, 1997, did away with the presumption that a child born to a married woman was the offspring of the woman's husband. *See* Tenn. Code Ann. § 36-2-304(a)(1), -304(c). It also specifically authorized any man claiming to be a child's father to file suit to establish parentage regardless of the marital status of the child's mother. *See* Tenn. Code Ann. § 36-2-305(b)(1)(C). In addition, the Act contained a limitations provision requiring parentage actions that would rebut the presumption of parentage based on the marriage of the child's parents to be filed within two years of the birth of the child. *See* Tenn. Code Ann. § 32-2-304(b) (Supp. 1997).[8]

The Tennessee Supreme Court handed down its decision in both cases on March 30, 1998. *See Evans v. Steelman*, 970 S.W.2d 431 (Tenn. 1998). The Court found that the now-repealed Tenn. Code Ann. § 36-2-202 was constitutional and that Mr. Cihlar did not have standing to legitimate his son. *See Evans v. Steelman*, 970 S.W.2d at 434. Even though the Court noted that the General Assembly had replaced the legitimation and paternity statutes with the action to establish parentage,

---

[3](...continued)
App. 1996).

[4]*See Evans v. Steelman*, No. 01A01-9511-JV-00508, 1996 WL 557844 (Tenn. Ct. App. Oct. 2, 1996), *perm. app. granted*, (Tenn. Jan. 27, 1997).

[5]The paternity statutes, Tenn. Code Ann. §§ 36-2-101, -115 (repealed 1997), provided women with a vehicle to obtain a judicial declaration regarding the identity of their child's father.

[6]The legitimation statutes, Tenn. Code Ann. §§ 36-2-201, -210 (repealed 1997), provided men with a vehicle for obtaining judicial recognition of their parental rights as a child's biological father.

[7]*See* Act of May 29, 1997, ch. 477, 1997 Tenn. Pub. Acts 862, codified at Tenn. Code Ann. §§ 36-2-301, -322 (Supp. 1999).

[8]This provision was the sole exception to the general statute of limitations providing that actions for parentage could be filed up until three years beyond the child's age of majority. *See* Tenn. Code Ann. § 36-2-306(a) (Supp. 1999). In 1998, the General Assembly amended Tenn. Code Ann. § 36-2-304(b) to shorten the two-year limitations period to twelve months and to limit the circumstances to which it would apply. Following the 1998 amendment, the shortened limitations period could only be invoked when (1) the mother was married and living with her husband at the time of conception, (2) if she has "remained together with that husband through the date a petition to establish paternity is filed," and (3) the mother and her husband file a sworn answer stating that the husband is the father of the child. *See* Act of April 29, 1998, ch. 1098, § 8, 1998 Tenn. Pub. Acts 1113, 1116, codified at Tenn. Code Ann. § 36-2-304(b)(2)(A). Neither version of this statute of limitations period figures in the resolution of this case because Mr. Crawford never asserted a statute of limitations defense to either Mr. Cihlar's legitimation petition or to the parentage action filed in August 1998.

it declined to permit either Mr. Cihlar or Mr. Evans to take advantage of the new statutes because the General Assembly had specifically declined to make the new statutory provisions apply to legitimation or paternity actions filed before July 1, 1997. *See Evans v. Steelman*, 970 S.W.2d at 432.

On August 10, 1998, the State of Tennessee, acting pursuant to its federally mandated prerogatives under Title IV-D of the Social Security Act, filed a petition in the Davidson County Juvenile Court to establish that Mr. Cihlar was Sean's biological father.[9] A juvenile court referee appointed a guardian ad litem for Sean, and the guardian later filed a supplemental petition on behalf of Sean seeking a formal parentage determination. Mr. Cihlar also retained a lawyer to represent his interests during the juvenile court proceedings. Mr. Crawford opposed this petition.[10] Following a hearing, the juvenile court referee entered an order concluding that Mr. Cihlar was the biological and legal father of Sean Michael Crawford. The order, which was affirmed by the juvenile court judge on April 7, 1999, also established Mr. Cihlar's child support obligation and his visitation and other rights. Mr. Crawford as appealed from the juvenile court judge's order.

Less than one month after Mr. Crawford filed his notice of appeal, the General Assembly again amended the statutes governing actions to establish parentage to express its "clear and unequivocal" intent for the new parentage statutes to apply retroactively to biological fathers whose legitimation actions filed prior to July 1, 1997 were dismissed either because of the biological father's lack of standing or the irrebuttable presumption of parentage arising from the marital status of the child's mother. *See* Act of May 24, 1999, ch. 339, Tenn. Pub. Acts 756, codified at Tenn. Code Ann. § 36-2-304(b)(2)(B). There can be little doubt that the General Assembly enacted this amendment to address the Tennessee Supreme Court's holding in *Evans v. Steelman* regarding the retroactive application of the 1997 statutes creating the cause of action to establish parentage.

# I.
## STANDING TO PURSUE A PARENTAGE DETERMINATION

We turn to the standing issue first. Clearly, Tenn. Code Ann. § 36-2-305(b)(1) empowered not only Mr. Cihlar, but also Sean and the State, to file an action to establish parentage. However,

---

[9] The suit was filed by Child Support Services, Inc., a private company with whom the Tennessee Department of Human Services had contracted to provide Title IV-D child support collection services. *See State ex rel. Brown v. Brown*, No. 01A0-9509-CV-00428, 1997 WL 749452, at *1 n.2 (Tenn. Ct. App. Dec. 5, 1997) (No Tenn. R. App. P. 11 application filed).

[10] While some of the pleadings include Ms. Crawford's name, they do not consistently indicate whether she actively opposed the petition to establish parentage filed in the juvenile court. All the early pleadings refer only to Mr. Crawford as the sole "respondent," and his lawyer's motion to be relieved states that Mr. Crawford was his only client. Ms. Crawford has not signed any of Mr. Crawford's pro se papers. Accordingly, we will refer to Mr. Crawford individually in this opinion.

Mr. Crawford asserts that the doctrines of res judicata and collateral estoppel prevent Mr. Cihlar and anyone in privity with him from filing suit seeking this remedy because the Tennessee Supreme Court had already determined that Mr. Cihlar lacked standing to legitimate Sean. We disagree for two reasons. First, the legal relations of the parties changed in a material way after the Tennessee Supreme Court's opinion when the General Assembly specifically empowered persons like Mr. Cihlar to file actions to establish parentage. Second, even if Mr. Cihlar himself could not file an action to establish parentage, both Sean and the State of Tennessee could because they are not in privity with Mr. Cihlar, even though their interests are related.

## A.
### RES JUDICATA AND COLLATERAL ESTOPPEL

Res judicata and collateral estoppel are related preclusion doctrines with common purposes. They promote finality in litigation in order to conserve judicial resources and to relieve litigants from the cost and vexation of multiple lawsuits. *See Beaty v. McGraw*, 15 S.W.3d 819, 824 (Tenn. Ct. App. 1998); *Lien v. Couch*, 993 S.W.2d 53, 55-56 (Tenn. Ct. App. 1998).

Res judicata is a claim preclusion doctrine. *See Moulton v. Ford Motor Co.*, 533 S.W.2d 295, 296 (Tenn. 1976). It bars a second suit between the same parties or their privies on the same cause of action with respect to all issues which were or could have been raised in the former suit. *See Richardson v. Tennessee Bd. of Dentistry*, 913 S.W.2d 446, 459 (Tenn. 1995); *Hampton v. Tennessee Truck Sales, Inc.*, 993 S.W.2d 643, 645 (Tenn. Ct. App. 1999). However, a previous judgment cannot extinguish a claim that did not exist and could not possibly have been sued upon in the previous case. *See Lawlor v. National Screen Serv. Corp.*, 349 U.S. 322, 328, 75 S. Ct. 865, 868 (1955); *St. Pierre v. Dyer*, 208 F.3d 394, 400 (2d Cir. 2000); *Landeros v. Pankey*, 46 Cal. Rptr. 2d 165, 169 (Ct. App. 1995); *Lien v. Couch*, 993 S.W.2d at 56. In addition, a prior judgment for the defendant, although valid and final, does not bar the plaintiff from filing another action on the same claim when, either by statute or rule of court, the judgment does not operate as a bar to another action on the same claim. *See* Restatement (Second) of Judgments § 20(1)(c) (1982).

Collateral estoppel is an issue preclusion doctrine. *See Dickerson v. Godfrey*, 825 S.W.2d 692, 694 (Tenn. 1992); *Goeke v. Woods*, 777 S.W.2d 347, 349 (Tenn. 1989). Once an issue has been actually or necessarily determined by a court of competent jurisdiction, the doctrine of collateral estoppel renders that determination conclusive on the parties and their privies in subsequent litigation, even when the claims or causes of action are different. *See Massengill v. Scott*, 738 S.W.2d 629, 631 (Tenn. 1987); *King v. Brooks*, 562 S.W.2d 422, 424 (Tenn. 1978); *Beaty v. McGraw*, 15 S.W.3d at 824. It applies to both issues of law and issues of fact.[11] *See* Restatement (Second) of Judgments § 27 (1982). Courts in other jurisdictions have invoked the doctrine of collateral estoppel to prevent the relitigation of standing issues decided in earlier proceedings. *See Fulani v. Bentsen*, 862 F. Supp. 1140, 1150-51 (S.D.N.Y. 1994); *Gladysz v. Planning & Zoning*

---

[11] The juvenile court referee's reasoning that collateral estoppel applies only to issues of fact is incorrect in this regard. However, even though the reasoning is flawed, the referee correctly determined that the doctrine of collateral estoppel did not bar Mr. Cihlar's claim under the parentage statutes.

*Comm'n*, 750 A.2d 507, 513 (Conn. App. Ct. 2000); *Janitschek v. Trustees of Friends World College*, 671 N.Y.S.2d 490, 492 (App. Div. 1998).

The relitigation of an issue of law between the same two parties is not precluded when a new determination is warranted in order to take account of an intervening change in the applicable law or to avoid the inequitable administration of the law. *See* Restatement (Second) of Judgments § 28(2) (1982); *Jackson v. City of College Park*, 496 S.E.2d 777, 780 (Ga. Ct. App. 1998); *Esslinger v. Baltimore City*, 622 A.2d 774, 784 (Md. Ct. Spec. App. 1993); *Borough of Prospect v. Bauer*, 715 A.2d 1244, 1245-46 (Penn. Commw. Ct. 1998); *Marino v. State Farm Fire & Cas. Ins. Co.*, 787 S.W.2d 948, 950 (Tex. 1990); *Thompson v. Department of Licensing*, 982 P.2d 601, 610 (Wash. 1999).

## B.
### MR. CIHLAR'S STANDING

At the outset, we must determine whether the question of Mr. Cihlar's standing implicates the doctrine of res judicata or the doctrine of collateral estoppel or both. The question of standing is an issue rather than a substantive claim. Accordingly, the doctrine of collateral estoppel, as opposed to the doctrine of res judicata, applies in this case. We will, therefore, limit our discussion to the doctrine of collateral estoppel.[12] The doctrine of collateral estoppel does not prevent Mr. Cihlar from pursuing his parentage claim for three reasons. First, the law had changed significantly between the time Mr. Cihlar brought his original legitimation claim and the time he filed suit under the 1997 parentage statutes. Where the prior legitimation statutes had been construed not to provide putative fathers like Mr. Cihlar standing, the new statutes were much broader. Tenn. Code Ann. § 36-2-305(b)(1)(C) specifically gives Mr. Cihlar standing to file suit to establish his paternity even though Ms. Crawford was married to another man both when the child was conceived and born.

The second reason for not invoking collateral estoppel in this case is that the new parentage statutes specifically exempt certain litigants from the operation of res judicata and collateral estoppel. Tenn. Code Ann. § 36-2-304(b)(2)(B) states that both doctrines shall not apply to putative fathers who petitioned to legitimate their children prior to July 1, 1997 and whose petitions were dismissed based on the mother's marriage to another man at the time of conception or the putative father's lack of standing. Mr. Cihlar complies with both of these requirements.

The third reason for granting Mr. Cihlar standing to assert his parentage claim is based on fairness and equity. The 1997 parentage statutes reflect a legislative liberalization of the requirements imposed on biological fathers seeking legal recognition of their parentage. It would be inequitable to prevent fathers like Mr. Cihlar who have vigorously pursued legal recognition of their relationship with their children from taking advantage of the new statutes simply because of

---

[12] We note parenthetically that we would reach the same result regarding the issue of standing if we employed a res judicata analysis.

timing. Accordingly, we find that Mr. Cihlar has standing to pursue his parentage claim under the 1997 parentage statutes.

## C.
### THE OTHER PARTIES' STANDING

It could also be argued that the doctrine of collateral estoppel precludes Sean and the State from relitigating the standing question because they are in privity with Mr. Cihlar. This argument fails for three reasons. First, Mr. Cihlar has standing. Second, the 1997 parentage statutes specifically afford these parties standing independent of Mr. Cihlar. *See* Tenn. Code Ann. § 36-2-305(b)(1)(A), (D). Third, even though their claims are related to Mr. Cihlar's, neither Sean nor the State are in privity with Mr. Cihlar for collateral estoppel purposes.

In the context of both res judicata and collateral estoppel, the concept of privity relates to the subject matter of the litigation, *see Harris v. St. Mary's Med. Ctr., Inc.*, 726 S.W.2d 902, 905 (Tenn. 1987); *Shelley v. Gipson*, 218 Tenn. 1, 7, 400 S.W.2d 709, 712 (1966), not to the relationship between the parties themselves. *See Cantrell v. Burnett & Henderson Co.*, 187 Tenn. 552, 557-58, 216 S.W.2d 307, 309-10 (1948). Privity connotes an identity of interest, *see Kelly v. Cherokee Ins. Co.*, 574 S.W.2d 735, 738 (Tenn. 1978); *Cotton v. Underwood*, 223 Tenn. 122, 127, 442 S.W.2d 632, 634-35 (1969), that is, a mutual or successive interest to the same rights. *See Fultz v. Fultz*, 180 Tenn. 327, 330, 175 S.W.2d 315, 316 (1943); *Phillips v. General Motors Corp.*, 669 S.W.2d 665, 669 (Tenn. Ct. App. 1984).

While the State's and Sean's interests are related to Mr. Cihlar's, they are not identical. This lack of identity is most pronounced between the State's interests and Mr. Cihlar's interests. The State's interests are essentially two-fold: (1) to see that "justice is done" and (2) to reduce the number of persons forced to enter the welfare rolls. *See Mills v. Habluetzel*, 456 U.S. 91, 103, 102 S. Ct. 1549, 1557 (1982) (O'Connor, J., concurring). In contrast, Mr. Cihlar's interests involve not only support matters but also personal matters such has his emotional bonds with the child, the ability to continue his name, and other rights stemming from a parent-child relationship. *See* Tenn. Code Ann. §§ 36-2-311, -313. The lack of identity between the interests of the government and those of the parents or the child have prompted a number of courts, including Tennessee's courts, to decline to invoke either collateral estoppel or res judicata in disputed parentage cases. *See Tennessee Dep't of Human Servs. v. Skinner*, Shelby Cir. No. 54, 1987 WL 25384, at \*1-2 (Tenn. Ct. App. Dec. 4, 1987) (No Tenn. R. App. P. 11 application filed); *see also In re Hall*, 977 P.2d 776, 781 (Ariz. 1999); *S.O.V. v. People ex rel. M.C.*, 914 P.2d 355, 360 (Colo. 1996); *Marsh v. Paternity of Rogers*, 659 N.E.2d 171, 173 (Ind. Ct. App. 1995); *State ex rel. Smith v. Smith*, 674 N.E.2d 398, 401-02 (Ohio Ct. App. 1996); *In re Chad M.G.*, 535 N.W.2d 97, 99 (Wis. Ct. App. 1995).

Similarly, courts have determined that a child's interest in a determination of his or her parentage is not identical to either or both of the parents' interests. *See T.K.S. v. State ex rel. M.S.B.*, 673 So. 2d 429, 432 (Ala. Civ. App. 1995) (mother); *In re Parentage of Mayberry*, 584 N.E.2d 533, 535 (Ill. App. Ct. 1991) (mother); *Department of Human Servs. ex rel. Boulanger v. Comeau*, 663 A.2d 46, 48-50 (Me. 1995) (both parents); *In re Estate of Quintero*, 569 N.W.2d 889, 894 (Mich.

Ct. App. 1997) (both parents); *R.B. v. C.S.*, 536 N.W.2d 634, 638 n.2 (Minn. Ct. App. 1995) (both parents); *Leguillon v. Leguillon*, 707 N.E.2d 571, 578 (Ohio Ct. App. 1998) (both parents); *Shirley v. Javan*, 684 A.2d 1088, 1090 (Pa. Super. Ct. 1996) (mother); *In re Paternity of Amber J.F.*, 557 N.W.2d 84, 86-87 (Wis. Ct. App. 1996) (mother). One court has also aptly noted that a child's interests may not only differ from the interests of one or both of his or her parents but may also conflict with them. *See In re Hall*, 977 P.2d at 781-82.

The existence of privity or identity of interest for the purpose of applying res judicata and collateral estoppel depends on the facts of each case. *See Mower County Human Servs. v. Graves*, 611 N.W.2d 386, 388 (Minn. Ct. App. 2000). Based on the facts of this case, we find that the State's interests in this proceeding differ from those of Mr. Cihlar. We also find that Mr. Cihlar's interests are not necessarily identical to his son's interests. Accordingly, for the purposes of applying res judicata and collateral estoppel, we find that neither the State nor Sean is in privity with Mr. Cihlar regarding the subject matter of this litigation. Without this privity of interest, they are not barred from proceeding in their own right by the earlier judicial determination that Mr. Cihlar lacked standing to adjudicate the question of parentage under the former statutes.

## II.
### THE CONSTITUTIONALITY OF THE PARENTAGE STATUTES

Mr. Crawford challenges the constitutionality of the 1997 parentage statutes on the ground that they permit persons like Mr. Cihlar to interfere with his constitutionally protected right of parental privacy. While the right of parents to raise their children free from unwarranted governmental intrusion is entitled to constitutional protection, we find that Mr. Crawford's attack on the parentage statutes must fail for two reasons. First, we have determined that the General Assembly, in enacting the 1997 parentage statutes, has struck a constitutionally defensible balance among the competing interests implicated whenever a child's parentage is in question. Second, under the facts of this case, any interest in preserving whatever may remain of the Crawfords' "familial" relationship or of Mr. Crawford's relationship with Sean is weak.

### A.

Tennessee's General Assembly and judiciary have long recognized the family as a vital societal institution. For example, the General Assembly has stated that it is "the long-standing public policy of this state to recognize the family as essential to social and economic order and the common good and as the fundamental building block of our society." Tenn. Code Ann. § 36-3-113(a) (1996). Similarly, the Tennessee Supreme Court has noted that "parental autonomy is basic to the structure of our society because the family is 'the institution by which we inculcate and pass down many of our most cherished values, moral and cultural.'" *Davis v. Davis*, 842 S.W.2d 588, 601 (Tenn. 1992) (quoting *Bellotti v. Baird*, 443 U.S. 622, 634, 99 S. Ct. 3035, 3043 (1979)).

Many of these statements regarding the importance of families have been made with reference to the traditional notion of a nuclear family - a married woman and man with their children, if any. *See* Tenn. Code Ann. § 36-3-113(b); *Perrin v. Perrin*, 201 Tenn. 354, 366, 299 S.W.2d 19,

24 (1957) (noting that marriage is the foundation of the family and society); *McCormick v. State*, 135 Tenn. 218, 226, 186 S.W. 95, 97 (1916) (noting that the State had a deeply rooted interest in the protection of the peace of families and in the maintenance of the sacred institution of marriage); *Lonas v. State*, 50 Tenn. (3 Heisk.) 287, 309 (1871) (characterizing marriage as the most elemental and useful social relation); *McKinney v. Clarke*, 32 Tenn. (2 Swan) 321, 324 (1852) ( characterizing marriage as the very foundation of all social order and morality). However, the courts have expanded the concept of "family" to include other relationships, such as a child living with his grandmother, uncle, and cousin in subsidized housing, *see Moore v. City of East Cleveland*, 431 U.S. 494, 504-05, 97 S. Ct. 1932, 1938 (1977), or a divorced parent with custody of her child or children. *See Rust v. Rust*, 864 S.W.2d 52, 55 (Tenn. Ct. App. 1993).

The integrity of these "family" units has found protection against unwarranted governmental interference in the Due Process Clause of the Fourteenth Amendment and Tenn. Const. art. I, § 8. *See Cleveland Bd. of Educ. v. LaFleur*, 414 U.S. 632, 639-40, 94 S. Ct. 791, 796 (1974); *In re Swanson*, 2 S.W.3d 180, 187 (Tenn. 1999); *Broadwell v. Holmes*, 871 S.W.2d 471, 475 (Tenn. 1994); *Hawk v. Hawk*, 855 S.W.2d 573, 579 (Tenn. 1993). A parent's right to raise his or her children without unwarranted governmental interference is a fundamental liberty interest, *see State ex rel. T.H. v. Min*, 802 S.W.2d 625, 626 (Tenn. Ct. App. 1990). Accordingly, the State may not interfere with a parent's exercise of these rights unless it has a compelling interest for doing so. *See Davis v. Davis*, 842 S.W.2d at 602; *State Dep't of Human Servs. v. Ogle*, 617 S.W.2d 652, 656 (Tenn. Ct. App. 1980).

More recently, the courts have recognized that the biological father of a non-marital child may have parental rights commensurate with those of married parents or divorced custodial parents. The Tennessee Supreme Court has held that a biological father of a non-marital child who has developed a substantial relationship with the child has a fundamental liberty interest entitled to due process protection. *See Petrosky v. Keene*, 898 S.W.2d 726, 728 (Tenn. 1995); *Nale v. Robertson*, 871 S.W.2d 674, 678 (Tenn. 1994). This court has also held that the biological father of a non-marital child who has attempted in good faith to establish a relationship with his child has a right to attempt to create a legally recognized parent-child relationship. *See In re Hood*, 930 S.W.2d 575, 578-79 (Tenn. Ct. App. 1996). As a result of these decisions, the parental rights of biological fathers of non-marital children are entitled to the same constitutional protection as the rights of married parents and divorced custodial parents, as long as the biological father has established a substantial relationship with the child.

### B.

In contrast to the judicial efforts to give constitutional substance to the parental rights of married parents, divorced custodial parents, and biological fathers of non-marital children, Tennessee's courts have avoided providing any sort of constitutional protection to biological fathers of children whose mother is married to another man. While marital infidelity is certainly not a modern phenomenon, *see, e.g., Cannon v. Cannon*, 26 Tenn. (7 Humph.) 410 (1846), the courts have held that a putative father's biological relationship to a child does not, by itself, counterbalance society's interests in preserving the traditional family unit, maintaining family harmony, and

promoting what the courts perceive to be the child's best interests. *See In re A.*, 735 S.W.2d 232, 237 (Tenn. Ct. App. 1987). Accordingly, the courts have used a procedural device to prevent these fathers from even seeking a judicial determination of their parentage.

At common law, a child born to a married woman was presumed to be the child of the woman's husband. Many jurisdictions, either by statute or court decision, viewed this presumption as conclusive absent proof of the non-access or sterility. Tennessee, however, was among the states that permitted the presumption to be rebutted by clear and convincing evidence of matters other than non-access or sterility. *See Jackson v. Thornton*, 133 Tenn. 36, 39, 179 S.W. 384, 384 (1915); *Frazier v. McFerren*, 55 Tenn. App. 431, 440, 402 S.W.2d 467, 472 (1964). Thus, the Tennessee Supreme Court has permitted a decedent's family members to challenge an individual's right to share in the estate on the ground that the decedent was not her biological father. The decedent's family prevailed by presenting proof of the decedent's wife's "notoriously licentious conduct" and her "habit of intimacy" with another man. *Cannon v. Cannon*, 26 Tenn. (7 Humph.) at 411.

Even though Tennessee's common-law presumption of marital paternity was rebuttable, the Tennessee courts have consistently declined to give biological fathers of children born to women married to another the opportunity to establish their parentage. Reflecting their disapproval of men having affairs with married women, the courts have declined to even give standing to biological fathers who seek a judicial declaration of their parentage. In the first reported case on this subject, this court based its decision that a biological father lacked standing on an extremely narrow interpretation of the legitimation statutes. The statutes permitted legitimation proceedings only for a "child not born in lawful wedlock." The court construed the phrase to include only children born to unmarried women. Thus, said the court, the statute did not apply to children whose mothers were married, even if they were married to someone other than the child's biological father. *See Cunningham v. Golden*, 652 S.W.2d 910, 912-13 (Tenn. Ct. App. 1983).

The Tennessee Supreme Court addressed the standing question for the first time in 1998 in the precursor to this proceeding. On that occasion, the court simply chose to adopt the reasoning of *Cunningham v. Golden*. To support its decision, the court noted that the General Assembly had acquiesced for fifteen years in the interpretation of the legitimation statutes in *Cunningham v. Golden* and, therefore, that the General Assembly must not have intended to give biological fathers of children born to married women any sort of legally protected interest in their relationship with their child. *See Evans v. Steelman*, 970 S.W.2d at 434-35. Accordingly, the court made a marked distinction between the rights of biological fathers of children born to unmarried women and those of biological fathers of children born to married women.

## C.

As the preceding discussion indicates, Tennessee's pre-1997 law governing disputes over the parentage of children born to married women, like the law in many other states, was a curious admixture of ancient, common-law presumptions, statutes, judicial interpretations of these statutes, and legislative acquiescence in the judicial interpretations. *See Brian C. v. Ginger K.*, 92 Cal. Rptr. 2d 294, 298 (Ct. App. 2000). Both this court and the Tennessee Supreme Court had recognized the

General Assembly's authority to permit putative biological fathers of children born to married women to establish their parentage but had concluded that the General Assembly had chosen not to do so. *See Evans v. Steelman*, 970 S.W.2d at 434; *Cunningham v. Golden*, 652 S.W.2d at 911, 913. In 1997, the General Assembly exercised its prerogative to repeal the former paternity and legitimation statutes and to replace them with the current parentage statutes. These new statutes mark a watershed in this state's recognition of the right of putative biological fathers to establish their parentage notwithstanding the marital status of the child's mother.

Great changes in our society's social structure had occurred by the time the General Assembly revisited the matter of the rights of biological fathers to establish the parentage of their children. Among these changes were (1) the increasing number of children born to unmarried women, (2) the increasing rate of divorce, (3) the increasing number of children living in households in which one or both of their biological parents are absent, and (4) the increasing awareness of the reality of extra-marital sexual conduct by both men and women. During the same period, minimally invasive scientific tests had been developed to reliably determine a child's parentage. The courts had also recognized the rights of biological fathers who desire to shoulder their parental responsibilities, and both the federal government and the states had stepped up their efforts to require biological fathers, whether married to the child's mother or not, to fulfill their obligation to support their children financially.

In no sense did the General Assembly retreat from its expressed policy favoring the importance of the traditional family unit. However, in 1997 and in practical recognition of modern realities, the General Assembly unambiguously disavowed *Cunningham v. Golden*, thereby signaling that it no longer acquiesced in the courts' deference to the ancient presumption of marital parentage. Tenn. Code Ann. § 36-2-304(c) explicitly abolishes this presumption. In its place, the General Assembly recognized five rebuttable parentage presumptions. Two of these presumptions are the presumption of parentage arising from a man's marriage to a child's mother at the time of conception, *see* Tenn. Code Ann. § 36-2-304(a)(1), and the presumption of parentage arising from a genetic test showing a statistical probability of 95% or more that a particular man is a child's biological father. *See* Tenn. Code Ann. § 36-2-304(a)(5).[13] In addition, Tenn. Code Ann. § 36-2-305(b)(1)(C) permits any man claiming to be a child's father to file suit to establish parentage without reference to the marital status of the child's mother.

## D.

Like the courts that decided *Evans v. Steelman* and *Cunningham v. Golden*, the courts in other jurisdictions have recognized that balancing the competing interests when a child's paternity is disputed is essentially a legislative prerogative. Thus, when legislatures recognized a conclusive

---

[13]The parentage statutes, at least implicitly, permit more than one person to claim parentage of a child. *See* Tenn. Code Ann. § 36-2-305(b)(2) (stating that "several men may be named as the father"). These persons may claim the benefit of one or more of the presumptions in Tenn. Code Ann. § 36-2-304(a). Regrettably, the parentage statutes, unlike the Uniform Parentage Act, do not provide direction for resolving disputes when two men claim parentage of the same child based upon different presumptions. *See* Uniform Parentage Act § 4(b), 9B U.L.A. 299 (1987).

presumption of parentage stemming from a man's marriage to a child's mother, the courts noted that they were essentially making a public policy statement that the scales should be balanced in favor of preserving the integrity of the family unit. *See Vincent B. v. Joan R.*, 179 Cal. Rptr. 9, 10 (Ct. App. 1981). They likewise noted that a legislature may give greater weight to the interests of biological fathers if it desires to do so. *See Michael H. v. Gerald D.*, 491 U.S. 110, 128-30, 109 S. Ct. 2333, 2345-46 (1989); *K.S. v. R.S.*, 669 N.E.2d 399, 404 (Ind. 1996) (holding that states may regulate a putative father's interests through properly drawn statutes); *David V.R. v. Wanda J.D.*, 907 P.2d 1025, 1028 (Okla. 1995) (deferring to the presumption established by the legislature); *In re J.W.T.*, 872 S.W.2d 189, 202 (Tex. 1994) (Cornyn, J., dissenting) (noting that the legislature could choose to protect the marital family over the rights of the biological father). A great majority of states now give all biological fathers the right to establish their parentage by rebutting the presumption that a child born to a married woman is the child of the woman's husband. *See Weidenbacher v. Duclos*, 661 A.2d 988, 999 (Conn. 1995).

The husband of a child's mother at conception or birth presumptively has interests in his relationship with the child that are entitled to constitutional protection. While the Tennessee Constitution does not require that the relationship be placed beyond any sort of government control, it does require that the State have a compelling interest for intruding into the otherwise private domain of the parent-child relationship. We have identified five substantial interests that support providing a procedure for assuring the timely and accurate resolution of parentage disputes. First, the State has an interest in eliminating uncertainty and confusion regarding a child's parentage. Second, the State has an interest in enforcing a biological father's obligation to support his children in order to prevent them from entering the welfare rolls. Third, the State has a responsibility to eliminate disparate treatment between marital and non-marital children. Fourth, the State has an interest in protecting the interests of biological fathers who have made, or are prepared to make, a substantial personal investment in their relationship with their children. Finally, the State has an interest in enabling children to ascertain the identity of their biological parents for medical or other health reasons. Accordingly, we find that the State has compelling interests that justify establishing a procedure for resolving parentage disputes and for making this procedure available to not only the child and the child's mother and her husband, but also to any man claiming to be the child's biological father.

We must still decide, however, what elements must be included in a statutory procedure for resolving parentage disputes in order to assure that the interests of persons like Mr. Crawford are protected. There are two essential ingredients. First, the procedure must comply with minimum procedural due process requirements which include adequate notice, an opportunity to present evidence, and a decision based on the evidence by an impartial trier-of-fact. Second, the procedure should enable the trier-of-fact to consider the level of commitment to parenthood that the presumptive father or fathers have demonstrated. Accordingly, courts called upon to resolve parentage disputes should be able to take into consideration: (1) the stability of the child's current family environment, (2) the existence of an on-going family unit, (3) the source or sources of the child's support, (4) the child's relationship with the presumptive father, and (4) the child's physical, mental, and emotional needs. *See Turner v. Whisted*, 607 A.2d 935, 940 (Md. 1992).

Tennessee's 1997 parentage statutes, as amended, contain these necessary elements. We have concluded that they do not impermissibly interfere with familial privacy interests, *see Finnerty v. Boyett*, 469 So. 2d 287, 292 (La. Ct. App. 1985), or with the rights and interests of a husband of a woman whose child's parentage is disputed. Accordingly, we find that the 1997 parentage statutes are constitutional on their face.

**E.**

Even though we have upheld the facial constitutionality of the 1997 parentage statutes, we must still determine whether these statutes were constitutionally applied to Mr. Crawford. Mr. Crawford has not taken issue with the procedural aspects of the proceedings below. Accordingly, the only remaining issue is whether the juvenile court based its conclusion that Mr. Cihlar was Sean's biological father on the proper factors. We have determined that the record overwhelmingly supports the juvenile court's decision that Mr. Cihlar is Sean's biological father.

This case is, in reality, a dispute between two men who are presumptively Sean's father. Mr. Crawford is presumptively the boy's father because he was married to Sean's mother both when the boy was conceived and when he was born. *See* Tenn. Code Ann. § 36-2-304(a)(1). But Mr. Cihlar is also presumptively Sean's father because genetic testing has confirmed his parentage by a probability factor of 99.98%. *See* Tenn. Code Ann. § 36-2-304(a)(5). In addition to the genetic proof, the parties' conduct since December 1990 indicates that each of them, including Sean himself, have known that Mr. Cihlar is Sean's biological father. Mr. Cihlar has thus presented evidence to rebut the presumption of Mr. Crawford's parentage by far more than the preponderance of the evidence required by Tenn. Code Ann. § 36-2-304(b)(3). There can be no reasonable doubt that Mr. Cihlar is Sean's biological father.

In addition to being supported by the overwhelming weight of the evidence, the conclusion that Mr. Cihlar is Sean's biological father is supported by weighty policy considerations. As far as this record shows, Sean has never been part of a traditional family unit. He was conceived and born while his mother and her husband were separated. Even though his mother and her husband reunited from February 1992 until September 1993, they have since separated again. Even though the Crawfords apparently have no immediate plans to divorce, Ms. Crawford has entered a relationship with yet another man. Mr. Crawford has known that Sean was not his child since the boy was born. There is little evidence in the record that he has contributed significantly to Sean's support or that he has made efforts to establish a substantial relationship with the child. Under these facts, the State's interests in protecting the Crawford family or Mr. Crawford's relationship with Sean are extremely weak.

In circumstances such as this one, a parent's interest and ability to provide a child monetary and parental support are relevant. *See In re Paternity of B.J.H.*, 573 N.W.2d 99, 104 (Minn. Ct. App. 1998). The weight of the evidence again overwhelmingly favors Mr. Cihlar. While Mr. Crawford's efforts or desire to provide any sort of support to Sean are unclear, Mr. Cihlar's on-going efforts to be Sean's father are clear and sustained. Even before the child was born, Mr. Cihlar demonstrated his willingness to accept his parental responsibilities. After the child was born, Mr. Cihlar

consistently supplied monetary support and took advantage of every opportunity to develop a relationship with Sean. As a result of Mr. Cihlar's efforts, Sean treats him as his father.

Rather than severing an existing parental relationship, the order finding Mr. Cihlar to be Sean's biological father simply confirms and gives legal effect to a relationship known to all the parties. Accordingly, the juvenile court's order declaring Mr. Cihlar to be Sean's biological father simply provides legal substance to a relationship that has existed throughout the boy's life. Under these facts, determining that Mr. Cihlar's parentage claims are weightier than Mr. Crawford's does not impermissibly interfere with any rights Mr. Crawford may have stemming from his marriage to Ms. Crawford.

### III.
#### THE RETROSPECTIVE APPLICATION OF THE PARENTING STATUTES

As a final issue, Mr. Crawford asserts that permitting Mr. Cihlar to establish his parentage under the 1997 parentage statutes, as amended, violates Tenn. Const. art. I, § 20's prohibition of retrospective laws that impair vested rights. Even though the parentage statutes create a new remedy for Mr. Cihlar that did not exist prior to 1997, we have determined that the statutes do not impair Mr. Crawford's vested rights. Mr. Crawford does not have a vested right in preventing Mr. Cihlar from establishing that he is Sean's biological father.

Tenn. Const. art. I, § 20 prohibits the General Assembly from enacting retrospective laws or laws that impair contractual obligations. The Tennessee Supreme Court has characterized a retrospective law as one that takes away or impairs vested rights acquired under existing laws. *See Morris v. Gross*, 572 S.W.2d 902, 907 (Tenn. 1978); *Miller v. Sohns*, 225 Tenn. 158, 162-63, 464 S.W.2d 824, 826 (1971). Although the characteristics of vested rights elude precise definition, the court views a vested right as one "which it is proper for the state to recognize and protect and of which the individual could not be deprived without injustice." *Morris v. Gross*, 572 S.W.2d at 905. It also adopted a multi-factor analysis for identifying vested rights that includes consideration of the following factors: (1) whether the public interest is advantaged or retarded by the challenged statute, (2) whether the challenged statute gives effect to or defeats the affected person's bona fide intentions or reasonable expectations, and (3) whether the statute surprises persons who have long relied on a contrary state of the law. *See Doe v. Sundquist*, 2 S.W.3d 919, 924 (Tenn. 1999).

To decide this issue, we must first ascertain the nature of the vested right Mr. Crawford is claiming. He is not asserting a right akin to a statute of limitations defense to a cause of action for which the applicable statute of limitations has already expired.[14] Nor is he claiming some sort of interest in an earlier judicial determination that Mr. Crawford is Sean's biological father because no

---

[14]This circumstance clearly implicates a vested right. *See Wyatt v. A-Best Prods. Co.*, 924 S.W.2d 98, 103-04 (Tenn. Ct. App. 1995).

court has addressed the merits of that issue.[15] Mr. Crawford appears to be asserting that he had some sort of reasonable expectation that Mr. Cihlar will forever be procedurally unable to obtain a judicial declaration that he is Sean's biological father. Any such expectation, if in fact Mr. Crawford has it, is unreasonable.

Mr. Crawford has known that he is not Sean's biological father since the day the child was born. The record contains no evidence that he undertook to support Sean or to establish a parenting relationship with him in reliance on the assumption that he was Sean's father. To the contrary, this record indicates that Mr. Crawford knowingly permitted Mr. Cihlar to support Sean financially and that Mr. Crawford eventually turned his back on Ms. Crawford and Sean in September 1993 when he and Ms. Crawford separated for the second and final time. There is likewise no evidence in the record that the Tennessee Supreme Court's 1998 decision caused Mr. Crawford to alter his relationship with Sean.

All the factors identified by the Tennessee Supreme Court in *Doe v. Sundquist* militate against Mr. Crawford's Tenn. Const. art. I, § 20 claim. The public's interests were advanced by the enactment of the 1997 parentage statutes. Providing a new remedy to biological fathers like Mr. Cihlar did not impair any reasonable expectation by Mr. Crawford that his claim to be Sean's father would remain undisturbed nor destroy any previous adjudication that Mr. Crawford was Sean's biological father. Likewise, the enactment of the 1997 parentage statutes and the filing of Mr. Cihlar's parentage petition did not have the effect of increasing Mr. Crawford's obligations. To the contrary, Mr. Cihlar's pursuit of a declaration of parentage will eliminate any legal obligation that Mr. Crawford might have had to support Sean. Accordingly, we find no Tenn. Const. art. I, § 20 violation in permitting Mr. Cihlar to file a petition under the new parentage statutes to establish that he is Sean's biological father with all the accompanying rights and obligations.

## IV.

We affirm the juvenile court judgment determining that Mr. Cihlar is Sean's biological father and establishing Mr. Cihlar's parental rights and obligations in accordance with Tenn. Code Ann. §§ 36-2-311 through -313. We remand the case to the juvenile court for whatever further proceedings may be required and we tax the costs of this appeal to Ronald Shane Crawford for which execution, if necessary, may issue.

_____
WILLIAM C. KOCH, JR., JUDGE

---

[15]The Tennessee Supreme Court upheld this court's reversal of the earlier finding by the circuit court that Mr. Cihlar was Sean's biological father. The effect of reversing and dismissing Mr. Cihlar's earlier legitimation claim was to vacate the circuit court's parentage determination.

-15-