# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### April 17, 2002 Session

## STATE OF TENNESSEE, DEPARTMENT OF CHILDREN'S SERVICES v. C.H.H.
## In re:  A.N.R.

### Appeal from the Juvenile Court for Knox County
### No. J6139      Carey E. Garrett, Judge

#### FILED MAY 21, 2002

### No. E2001-02107-COA-R3-CV

The State of Tennessee, Department of Children's Services ("DCS") filed a petition seeking to terminate the parental rights of C.H.H. ("Father"), the biological father of the minor child, A.N.R. ("Child").  The Trial Court granted DCS' petition to terminate Father's parental rights.  Father appeals.  We affirm as modified and remand.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed As Modified; Case Remanded.

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which HOUSTON M. GODDARD, P.J., and HERSCHEL P. FRANKS, J., joined.

Lawrence M. House, Knoxville, Tennessee, for the Appellant, C.H.H.

Paul G. Summers and Douglas Earl Dimond, Nashville, Tennessee, for the Appellee, State of Tennessee, Department of Children's Services.

# OPINION

## Background

This matter involves the termination of the parental rights of C.H.H. as the biological father of the Child. Father had a long-term, extramarital affair with M.J.R. ("Mother").[1] During their affair, Mother gave birth to the Child in June 1994, and to twins in October 1995. A DNA paternity test taken by Father in 1999 showed he was the biological father of the Child but not the twins. Only the Child is the subject of this appeal.

Father claimed he was in Mother's home up to 2 times per week on average and that the three children believed he was their father. Father testified that, sometimes, Mother told him all three of the children were his. Other times, Mother told him he was the biological father only of the Child. On still other occasions, Mother denied Father was the biological father of any of the three children. Father testified Mother's answer to the question of paternity regarding the three children depended upon how Father and Mother were getting along. At any rate, Father testified he provided baby supplies, food and money to Mother, at a total value of approximately $7,000, plus rent.[2] Although Father provided no documentation of such support at trial, Father claimed he began keeping receipts and check stubs, when possible, for purchases he made for Mother and the three children. Father testified he began collecting documentation after Mother threatened to take him to court.

The record shows Mother had a drinking problem, and Father knew about her alcohol abuse. Father, however, denied Mother's drinking interfered with her ability to care for the children. Father also claimed he never saw the children in a neglected or hungry condition. Father testified Mother only had parties when Father was not going to be around and Mother would clean up her home when she knew Father was coming for a visit. Father testified he would call the Child, who was then approximately 3 years old, to check on whether the family needed groceries and if Mother was "being good." Father claimed he called the Child to double-check the information Mother gave him because the Child, three years old, was smart. Father further testified that during one of his visits to Mother's home, he discovered the Child's hands had been burned and the Child reported to him that hot water had caused the burns. In addition, the proof in the record shows that in 1997, and from January through April, 1998, DCS received 9 referral calls regarding Mother's alleged abuse or neglect of the children.

Father has been married to B.L.H. ("Wife") for over 30 years. While Father and Wife, who are both in their 50's, continue to reside together, they maintain separate bedrooms. Wife testified she had known about her husband's affair for approximately 5 years, beginning when

---

[1] The length of Father's and Mother's affair is unclear as the record shows its duration to be somewhere from 7 to 12 years. Mother is unmarried.

[2] The record shows that in 1996, Mother began living in rent-free public housing. Father testified he was not aware of this fact until April 1998.

Mother started making harassing telephone calls to Wife while Mother was drunk. Wife testified she noticed Father's frequent, overnight absences but assumed he was working. Wife testified she did not believe she and Father had a bad marriage and that the affair and the birth of the Child could not be changed. Wife testified she previously kept the three children in her home, and on one occasion, Father dropped off the children and left Wife to babysit them.

Father is retired and receives disability income in the amount of $1,200 per month for Meniere's Disease which causes him to suffer from dizziness. Father and Wife also currently own a used car business. Wife has another job from which she earns approximately $26,000 per year. Although Father denied receiving any income from the used car business, the couple's tax returns from 1994-99 show their combined yearly incomes totaled between approximately $61,000 and $71,000, with Father's individual yearly income ranging between $35,000-$45,000 for those years.

In April 1998, Mother failed to pick up the Child and the twins from daycare. Thereafter, DCS filed a Petition for Temporary Custody of the three children. Father testified that once he heard the children had been left at daycare and taken into emergency DCS custody, he, for the first time, admitted the affair to Wife and told her he may be the biological father of the three children. Thereafter, Father and Wife filed a petition seeking custody of the three children. In their petition for custody, Father and Wife described the "Circumstances of the Petitioner" as follows: "[Father] knows the children, likes and loves them wish [sic] for them to be in a better environment." Father and Wife, in response to questions on the petition form regarding the biological father of the children, stated that the information was "unknown." The record further shows that Mother, DCS employees, and the Child's guardian *ad litem* reported that Father told them he could not be the biological father of the children because he previously had a vasectomy. At trial, Father denied making this statement.

In May 1998, the Trial Court entered an Interim Order finding the three children to be dependent and neglected and placing them into the temporary custody of DCS. In December 1998, the Trial Court ordered Father to undergo DNA testing, at his expense, to determine paternity of the Child and the twins. The record shows Father previously had discussed paternity testing with a DCS employee, but Father did not pursue the test and asked if DCS would cover the cost. In February 1999, Father received the results of the DNA test which, as discussed, showed he was the biological father of only one of the three children, the Child.

Thereafter, Mother voluntarily surrendered her parental rights to the Child. In May 1999, DCS filed a petition seeking termination of Father's parental rights of all three children.[3] DCS

---

[3] Although in February 1999, the DNA paternity test results showed Father was the biological father of the Child but not the twins, DCS' petition to terminate Father's parental rights covered all three children. Although the record does not show that this petition was amended, DCS, thereafter, filed a petition to terminate the parental rights of another male regarding just the twins. The Trial Court entered an order terminating this man's parental rights to the

(continued...)

listed several grounds for their request to terminate Father's parental rights, including: (1) termination of Father's parental rights is in the best interest of the children; (2) Father failed to file a timely petition to establish paternity once he received notice of paternity; (3) Father failed to pay child support; and (4) a risk of substantial harm to the children's physical and psychological welfare exists if Father were awarded custody of the children.

In April and May 1999, the Trial Court Referee held a hearing on the petitions for custody. In its Order ("Custody Order"), the Trial Court Referee dismissed Father's and Wife's petition for custody, holding, in pertinent part, as follows:

> The Court finds that [Father] failed to take appropriate steps to protect these children from the risks their [Mother] presented due to her on-going alcohol abuse. The Court finds [Father's] testimony that he was totally unaware of [Mother's] problems incredible in light of his testimony, and hers, that he spent almost every Saturday night with her and that he was in her home briefly several times during the week consistently from 1982 or 1983 until about three months prior to the children's removal. The triangulation between [Father, his Wife, and Mother] has not been resolved. While [Father] testified that he has not had sexual relations with [Mother] since approximately three months prior to the children's removal, he is still involved with her, is still talking with her regularly and providing her support and money. [Father's Wife] had no real involvement with these children prior to the filing of this petition [for custody]. Despite [Father's] testimony of long-term, active involvement with these children, [the Child's] play, as observed by [the Child's] therapist, failed to demonstrate any active father figure in [the Child's] life. Raising these children will require teamwork, which is totally lacking in [Father's] household. [Father] also has serious health problems which would affect his ability to provide proper care and supervision for these young, active children.

The Trial Court Referee further found that the three children should remain in foster care and ordered DCS to develop a permanency plan for the children with the goal of adoption.

In August 1999, Father filed a Complaint to Establish Paternity regarding all three children and asked the Trial Court to enter an order of child support.[4] The record, however, is not clear when Father began making child support payments. Father testified he voluntarily made child

---

[3](...continued)
twins.

[4] Father later amended his complaint to seek paternity of only the Child.

support payments beginning in October 1998, in the amount of $225, which he had calculated to be 21% of his income. During her examination of Father at trial, counsel for DCS stated to the Trial Court that Father began making payments in October 1999, in the amount of $212 per month.

The record shows that in November 1999, at Father's request, an independent home study of Father's and Wife's home was conducted by Pam Wolfe, a licensed clinical social worker who is the director of an adoption agency. Wolfe testified she concluded Father and his Wife were not qualified to adopt in the state of Tennessee due to the couple's strained and distant relationship. Wolfe further testified Father did not have any remorse for his long-term extra-marital affair with Mother and that Wife characterized the affair as "just something that happened and that's the way it is." Wolfe's impression was Father and Wife could not work together as a team to raise the Child and that the couple's negative relationship would be harmful to the Child.

Wolfe also testified she had concerns about Father's health since he had Meniere's Disease which, according to Father, caused him to suffer from dizziness and would interfere with his ability to care for the Child while Wife was at work during the day. Wolfe also related she had concerns about Father's lack of understanding about the Child's need for stability and her attachment to her foster parents and siblings. According to Wolfe, Father threatened that if he did not prevail in his efforts to obtain custody of the Child, he would "do everything he could to disrupt [the Child's] placement [with the foster parents]."

DCS' Petition to Terminate Parental Rights and Father's Complaint to Establish Paternity were consolidated for trial which was held in October 2000. At the time of trial, the Child was 6 years old and had been living with the same set of foster parents for approximately 2.5 years. The Trial Court entered a Termination of Parental Rights and Final Decree of Guardianship ("Final Decree") granting DCS' Petition to Terminate Parental Rights and dismissing Father's Complaint to Establish Paternity. The Trial Court, as grounds to terminate Father's parental rights to the Child, found as follows:

> (1) Father failed to file a petition to legitimate the Child within 30 days of notice of alleged paternity. *See* Tenn. Code Ann. § 36-1-113(g)(9)(A)(vi);
>
> (2) Father abandoned the Child by willfully failing to support or make reasonable payments toward the support of the Child for the 4 consecutive months preceding the filing of DCS' Petition to Terminate Parental Rights. *See* Tenn. Code Ann. §§ 36-1-113(g)(1); 36-1-102(1)(A).
>
> (3) Father "failed, without good cause or excuse, to make reasonable and consistent payments for the support of the [C]hild in accordance with the child support guidelines. . . ." *See* Tenn. Code Ann. § 36-1-113(g)(9)(A)(ii).

(4) An award of legal and physical custody to Father "would pose a risk of substantial harm to the physical or psychological welfare of the [C]hild. . . ." *See* Tenn. Code Ann. § 36-1-113(g)(9)(A)(v).

Furthermore, the Trial Court, in its Final Decree, found that Father and Wife are not suitable parents to adopt any child "for the reasons set out in the home study conducted by [Pam Wolfe], the reasons noted in this Court's [Custody Order] dismissing their custody petition, and the testimony of various witnesses describing the history of their relationship. . . ." Moreover, the Trial Court further found, in the Final Decree, that terminating the parental rights of Father would serve the Child's best interests.

Father appeals. We affirm as modified and remand.

## **Discussion**

On appeal and although not exactly stated as such, Father raises the following issues: (1) whether the Trial Court erred in failing first to grant Father's Complaint to Establish Paternity before deciding DCS' Petition to Terminate Parental Rights; (2) whether the Trial Court erred in terminating Father's parental rights where DCS failed to establish grounds for termination by clear and convincing evidence; (3) whether the Trial Court erred in finding that Father had abandoned the Child as one of the grounds to terminate Father's parental rights; and (4) whether the Trial Court erred in determining that Father was not a fit parent to adopt the Child where that issue was not before the Trial Court. DCS raises no additional issues on appeal.

A review of the findings of fact by a trial court is *de novo* upon the record of the trial court, accompanied by a presumption of correctness, unless the preponderance of the evidence is otherwise. Tenn. Rule App. P. 13(d); *Brooks v. Brooks,* 992 S.W.2d 403, 404 (Tenn. 1999). Review of questions of law is *de novo,* without a presumption of correctness. *See Nelson v. Wal-Mart Stores, Inc.,* 8 S.W.3d 625, 628 (Tenn. 1999).

As a preliminary matter, we first address Father's argument that the Trial Court erred in failing to grant his Complaint to Establish Parentage before it decided DCS' Petition to Terminate Parental Rights. Since neither party disputes that Father is the biological father of the Child, we find this issue is moot.

The predominant question before this Court is whether the Trial Court erred in terminating Father's parental rights to the Child. Father contends the Trial Court erred in finding, as a ground for termination of his parental rights, that Father abandoned the Child. Father also argues the evidence was insufficient to warrant termination of his parental rights on any ground because DCS did not carry its burden of establishing grounds for termination by clear and convincing evidence.

It is well-established that, under the Tennessee and United States Constitutions, a parent has a fundamental right to the "custody and upbringing of his or her child." *In re Swanson*, 2 S.W.3d 180, 187 (Tenn. 1999) (citing *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *Nale v. Robertson*, 871 S.W.2d 674, 678 (Tenn. 1994)). This Court also has recognized that the parental rights of a biological father of non-marital children "are entitled to the same constitutional protection as the rights of married parents and divorced custodial parents, as long as the biological father has established a substantial relationship with the child." *State ex rel. Cihlar v. Crawford*, 39 S.W.3d 172, 182 (Tenn. Ct. App. 2000). "However, this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988).

Termination of parental or guardianship rights must be based upon a finding by the court by clear and convincing evidence that: (1) the grounds for termination of parental or guardianship rights have been established; and (2) termination of the parent's or guardian's rights is in the best interests of the child. Tenn. Code Ann. § 36-1-113(c). This Court discussed the "clear and convincing evidence" standard in *O'Daniel v. Messier,* 905 S.W.2d 182 (Tenn. Ct. App. 1995), as follows:

> The "clear and convincing evidence" standard defies precise definition. *Majors v. Smith,* 776 S.W.2d 538, 540 (Tenn. Ct. App. 1989). While it is more exacting than the preponderance of the evidence standard, *Santosky v. Kramer,* 455 U.S. at 766, 102 S. Ct. at 1401; *Rentenbach Eng'g Co. v. General Realty Ltd.,* 707 S.W.2d 524, 527 (Tenn. Ct. App. 1985), it does not require such certainty as the beyond a reasonable doubt standard. *Brandon v. Wright,* 838 S.W.2d 532, 536 (Tenn. Ct. App. 1992); *State v. Groves,* 735 S.W.2d 843, 846 (Tenn. Crim. App. 1987).
>
> Clear and convincing evidence eliminates any serious or substantial doubt concerning the correctness of the conclusions to be drawn from the evidence. *See Hodges v. S. C. Toof & Co.,* 833 S.W.2d 896, 901 n. 3 (Tenn. 1992). It should produce in the fact-finder's mind a firm belief or conviction with regard to the truth of the allegations sought to be established. *In re Estate of Armstrong*, 859 S.W.2d 323, 328 (Tenn. Ct. App. 1993); *Brandon v. Wright,* 838 S.W.2d at 536; *Wiltcher v. Bradley,* 708 S.W.2d 407, 411 (Tenn. Ct. App. 1985).

*O'Daniel v. Messier,* 905 S.W.2d at 188.

The grounds for termination of parental rights are set forth in Tenn. Code Ann. § 36-1-113(g). While Tenn. Code Ann. § 36-1-113(g) list several grounds for termination of parental rights, the establishment of any one of the grounds, by clear and convincing evidence, may warrant

a termination of parental rights. *In re C.W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000). The Final Decree shows the Trial Court relied upon four grounds found at Tenn. Code Ann. §§ 36-1-113(g)(1) and (9), which are as follows:

> (g) Initiation of termination of parental or guardianship rights may be based upon any of the following grounds:
>
> (1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;
>
> \* \* \* \* \* \* \* \*
>
> (9)(A) The parental rights of any person who is not the legal parent or guardian of a child or who is described in § 36-1-117(b) or (c) may also be terminated based upon any one (1) or more of the following additional grounds: . . .
>
> (ii) The person has failed, without good cause or excuse, to make reasonable and consistent payments for the support of the child in accordance with the child support guidelines promulgated by the department pursuant to § 36-5-101; . . .
>
> (v) Placing custody of the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child; or
>
> (vi) The person has failed to file a petition to establish paternity of the child within thirty (30) days after notice of alleged paternity by the child's mother, or as required in § 36-2-318(j), or after making a claim of paternity pursuant to § 36-1-117(c)(3).[5]

We must affirm the Trial Court's termination of Father's parental rights if the record shows that DCS established, by clear and convincing evidence, that any *one* of these grounds exists and that termination of Father's parental rights would serve the Child's best interests. *See In re C.W.W.*, 37 S.W.3d at 474; Tenn. Code Ann. § 36-1-113(c).

_____

[5] Tenn. Code Ann. § 36-1-113(g)(9)(B)(ii) provides 1 of 2 definitions of "notice" as follows:

> "Notice" also means the oral statement to an alleged biological father from a biological mother that the alleged biological father is believed to be the biological father of the biological mother's child.

We now address the Trial Court's determination that grounds exist to terminate Father's parental rights due to his willful failure to provide child support. The Trial Court, in its Final Decree, found that Father "has willfully failed to support or make reasonable payments toward the support of the [C]hild for four (4) consecutive months immediately preceding the filing of the petition in this cause. . . ." While the Trial Court did not specify upon which portion of Tenn. Code Ann. § 36-1-113(g) it relied in making this determination, this finding correlates to the language of Tenn. Code Ann. § 36-1-113(g)(1), which provides that termination of parental rights may be based upon "[a]bandonment by the parent . . ., as defined in § 36-1-102. . . ." The definitions, found at Tenn. Code Ann. § 36-1-102, pertinent to this matter are as follows:

> (1)(A) "Abandonment" means, for purposes of terminating the parental or guardian rights of parent(s) or guardian(s) of a child to that child in order to make that child available for adoption, that:
>
> (i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or *have willfully failed to support or make reasonable payments toward the support of the child.*

(emphasis added).

The statute, Tenn. Code Ann. § 36-1-102(1)(D), provides a definition of "willfully failed to support" or "willfully failed to make reasonable payments toward such child's support." The Supreme Court, however, in *In re Swanson*, held that the current, statutory "willful failure to support" definition of "abandonment" was unconstitutional because it created an "irrebuttable presumption that the failure to provide monetary support for the four months preceding the petition to terminate parental rights constitutes abandonment, irrespective of whether that failure was intentional . . . ." *In re Swanson*, 2 S.W.3d at 188. *Swanson* further held that "[u]ntil otherwise amended by our legislature, the definition [of abandonment] that was in effect under prior law shall be applied." *Id*. at 189. Thereafter, this Court, citing *In re Swanson*, used the prior statutory law from 1994 for both of the above definitions of the term "abandonment," holding as follows:

> Under the law as it existed prior to *In re Swanson*, an "abandoned child" was defined as
>
>> [a] child whose parents have willfully failed to visit or have willfully failed to support or make reasonable payments toward such child's support for four (4) consecutive months immediately preceding institution

of an action or proceeding to declare the child to be an
abandoned child.

*In re Adoption of Copeland*, 43 S.W.3d 483, 488 (Tenn. Ct. App. 2000) (quoting Tenn. Code Ann. § 36-1-102(1)(A)(i) (Supp. 1994) (alterations in original). *Copeland* further held that due to the *In re Swanson* decision, the 1994 law that is to be applied provides for an element of intent in both the "failure to visit" and "failure to support" definitions of "abandonment." *Id.*

On appeal, Father argues the Trial Court's termination of his parental rights on this ground is constitutionally fatal because the Trial Court did not make a finding that Father's failure to pay child support was intentional. Father also contends the proof shows he provided financial support to Mother and the three children and points to his testimony that he voluntarily made support payments in the amount of $225 per month beginning in October 1998.

A comparison of the constitutionally-permissible 1994 definition of "willful failure to support" and the language used by the Trial Court in its Final Decree shows that the Trial Court used the language found in the1994 statute. *See In re Swanson*, 2 S.W.3d at 189; *In re Adoption of Copeland*, 43 S.W.3d at 488. Accordingly, Father's argument that the Trial Court used unconstitutional definitions of "abandonment" and "willful failure to support" fails.

Moreover, the proof contained in the record on appeal shows that DCS carried its burden of establishing this ground by clear and convincing evidence. The record on appeal shows Father willfully failed to make reasonable payments for the benefit of the Child for the 4-month period preceding the filing date of the Petition to Terminate Parental Rights. The evidence contained in the record, however, does preponderate against the Trial Court's finding, in its Final Decree, that Father "provided no support whatsoever for this Child from her removal into foster care on April 14, 1998, until he began voluntary support payments in the amount of . . . ($212) per month in October 1999, eighteen months later." The record shows Father testified he voluntarily made support payments of $225 per month beginning in October *1998*, and this testimony is not disputed. The Trial Court's determination that Father's support payments began in October *1999*, appears, from the record, to be based solely upon the statements of DCS' counsel during trial. Nevertheless, given the level of Father's actual income, which far exceeded his disability income of $1,200 per month, the record shows Father's voluntary support payments in the amount of $225 per month, based upon 21% of Father's monthly disability income, were not reasonable. Moreover, the record on appeal shows Father's failure to make reasonable support payments was willful, or intentional, in light of Father's receipt of regular income. Accordingly, we hold that the record supports the Trial Court's determination that clear and convincing evidence showed that Father "abandoned" the Child as that term is defined by the 1994 statute as a ground to terminate Father's parental rights.

We next review the Trial Court's determination that Father's parental rights should be terminated based upon Tenn. Code Ann. § 36-1-113(g)(9)(A)(ii), finding that "[Father] has failed, without good cause or excuse, to make reasonable and consistent payments for the support of the [Child] in accordance with the child support guidelines. . . ." In light of our determination that the

-10-

record on appeal shows that clear and convincing evidence established that Father willfully failed to make reasonable child support payments for the 4-month period preceding the filing of the Petition to Terminate Parental Rights and due to the fact that Father's payments were well below the Child Support Guidelines amount, we find no error in this determination by the Trial Court.

Next, we consider whether the record supports the Trial Court's finding that an award of custody to Father would pose a risk of substantial harm to the physical or psychological welfare of the Child. On appeal, Father argues that this finding is not supported by clear and convincing evidence. Father contends the Trial Court based this determination upon the fact that the Child has been with the same foster parents since April 1998, and that the removal of the Child from the foster home would result in emotional harm to the Child. Father claims he did all he could do to obtain custody of the Child by filing his petition for custody.

In making this determination, the Trial Court, in its Final Decree, found that awarding legal and physical custody of the Child to Father, thereby removing the Child from the foster parents and the Child's siblings, would result in substantial physical or psychological harm to the Child. The Trial Court stated, in pertinent part, as follows:

> That awarding legal and physical custody of the [Child] to [Father] would pose a risk of substantial harm to the physical or psychological welfare of the [Child]; more specifically, the Court does not know why [Father] delayed taking action to claim this [Child], but the Court does know the results of this delay. This [Child] is now in a safe, secure and loving home with [the Child's] family. [The] foster parents are prepared to adopt [the Child and the twins]. [The Child and the twins] have lived in this home since April 21, 1998, and this is the only family [the Child] now knows. [The Child] is bonded to [the] foster parents and sees them as [the Child's] emotional/psychological parents. [The Child] is also securely attached to [the Child's younger siblings]. To remove [the Child] from [the foster parents and siblings] would be cruel and would cause grave trauma to this [Child].

The record on appeal supports the Trial Court's determination that an award of custody to Father would result in emotional harm to the Child. The evidence does not preponderate against the Trial Court's finding that after living with the same set of foster parents for two and a half years, the Child has formed a bond with the foster parents and sees them as parents. Moreover, the evidence does not preponderate against the Trial Court's finding that the Child is attached to her siblings with whom the Child has lived for most of her life. Pam Wolfe's evaluation of Father, however, shows Father has no regard for the strong bond the Child has with her siblings and with the foster parents. The record on appeal shows that, due to the negative emotional consequences that removal would have on the Child and due to Father's callous disregard for the relationship the Child has with the foster parents and siblings, an award of physical and legal custody to Father poses a risk

-11-

of substantial psychological harm to the Child. Accordingly, we find no error in the Trial Court's determination that this ground for termination of Father's parental rights was established by clear and convincing evidence.

Next, we review the Trial Court's determination that grounds exist for terminating Father's parental rights due to Father's failure to file a petition to establish paternity within 30 days of his receipt of notice of alleged paternity. *See* Tenn. Code Ann. § 36-1-113(g)(9)(A)(vi). Father contends this finding is not supported by clear and convincing evidence and points to Mother's statements to Father and others that Father was not the biological father of the Child. The proof in the record, however, shows that Father did not file a petition to establish paternity until August 1999, 6 months after he received the DNA paternity test results and long after the 30-day time limit contemplated by Tenn. Code Ann. § 36-1-113(g)(9)(A)(vi).[6]

In addition, the Trial Court's findings in the Final Decree show the Trial Court found Father's testimony regarding this issue not to be credible. These findings include the following: Father's frequent contact with Mother and the children and financial support thereof amounted to the behavior of a person who believed he was the children's biological father; Father began documenting his financial support of Mother and the children in an effort to build a potential child support defense; and Father's failure to take a paternity test until he was court-ordered to do so in February 1999, and his failure to file a petition to establish paternity until August 1999, "[have] something to do with a legal obligation to pay child support at guidelines level." It is apparent from these findings that the Trial Court did not believe Father's testimony that he did not receive notice he was the Child's biological father until he received the results of the DNA paternity test. The Trial Court's determinations regarding credibility are accorded deference by this Court. *Davis v. Liberty Mut. Ins. Co.*, 38 S.W.3d 560, 563 (Tenn. 2001). "[A]ppellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary." *Wells v. Tennessee Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999). Accordingly, in light of the deference we afford the Trial Court's determinations of credibility, we find no error in the Trial Court's determination that grounds exist to terminate Father's parental rights to the Child under Tenn. Code Ann. § 36-1-113(g)(9)(A)(vi).

Having affirmed that four statutory grounds for termination of Father's parental rights were proven by clear and convincing evidence, we now must determine whether the Trial Court erred in holding that the termination of Father's parental rights is in the best interests of the Child. Tenn.

---

[6] We note that our Supreme Court recently granted a Rule 11 application for permission to appeal a prior opinion of this Court which addressed this statutory ground for termination of parental rights, *Jones v. Garrett*, E2000-00196-COA-R3-CV, 2001 Tenn. App. LEXIS 840 (Tenn. Ct. App. Nov. 9, 2001), *appl. perm. app. granted 4/1/02*. As of the date of this opinion, our Supreme Court had not yet decided the matter. The outcome of the appeal of *Jones v. Garrett* to the Supreme Court and its potential effect on Tenn. Code Ann. § 36-1-113(g)(9)(A)(vi), however, will have no effect on our decision in this matter since we have affirmed the three other grounds to terminate Father's parental rights.

Code Ann. § 36-1-113(i) describes the standard for determining whether termination is in the best interests of the child in such cases:

> (i)    In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:
>
> (1)    Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
>
> (2)    Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
>
> (3)    Whether the parent or guardian has maintained regular visitation or other contact with the child;
>
> (4)    Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
>
> (5)    The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
>
> (6)    Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
>
> (7)    Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

> (8)     Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or
>
> (9)     Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i).

After careful consideration of the facts and circumstances contained in the record on appeal, we find no error in the Trial Court's conclusion that termination of Father's parental rights is in the Child's best interests. At best, Father's conduct regarding his acknowledgment of his paternity of the Child, who is now nearly 8 years old, can be characterized as purposeful ignorance. The record shows DCS established, by clear and convincing evidence, that Father and the Child do not have a meaningful relationship; that the Child would suffer emotionally from a change of caretakers after being in the care of the same set of foster parents with her siblings for what has now been 4 years; that Father was neglectful of the Child and the twins while they were living with an alcoholic Mother and failed to protect the children from the hazards of Mother's alcoholism; and that, as discussed, Father failed to pay child support consistent with the Child Support Guidelines amount. *See* Tenn. Code Ann. §§ 36-1-113(i)(4), (5), (6) & (9). In addition, as Pam Wolfe testified, the strained marriage of Father and Wife would not provide the Child with a stable, loving environment. *See* Tenn. Code Ann. §36-1-113(i)(1). Accordingly, we find the record contains clear and convincing evidence that termination of Father's parental rights would be in the Child's best interests.

Father's final issue on appeal concerns the Trial Court's determination that Father and Wife were not suitable parents to adopt the Child. Father argues that adoption of the Child was not at issue since no petition for adoption had been filed. We agree and hold that it was not necessary for the Trial Court to make this determination. This portion of the Final Decree is vacated.

## Conclusion

The portion of the Trial Court's judgment regarding the fitness of Father and Wife to adopt the Child at issue is vacated. All remaining portions of the Trial Court's judgment are affirmed, and this cause is remanded to the Trial Court for such further proceedings as may be required, if any, consistent with this Opinion and for collection of the costs below. The costs on appeal are assessed against the Appellant, C.H.H., and his surety.

_____
D. MICHAEL SWINEY, JUDGE