IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
March 1, 2022 Session



**CHRISTINA JANE COMPHER v. DANA JANELLE WHITFIELD**

**Appeal from the Juvenile Court for Rutherford County**
**No. JS-13389        Donna Scott Davenport, Judge**
_____

**No. M2021-00474-COA-R3-JV**
_____

This appeal is a parentage action involving a same-sex domestic partnership, in which the petitioner filed a petition seeking to be recognized as a legal parent of a child born by artificial insemination after the parties made the mutual decision to have the child. The juvenile court granted the respondent's motion to dismiss finding that the petitioner lacked standing. The petitioner appeals. We affirm.

**Tenn. R. App. P. Rule 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and W. NEAL MCBRAYER, J., joined.

Abby R. Rubenfeld, Nashville, Tennessee, and Laura D. Rogers, Memphis, Tennessee, for the appellant, Christina Jane Compher.

Morgan E. Smith, Nashville, Tennessee, for the appellee, Dana Janelle Whitfield.

**OPINION**

**I.        FACTS & PROCEDURAL HISTORY**

In 2002, Christina Jane Compher and Dana Janelle Whitfield were living in Maryland and began "a committed personal relationship and domestic partnership," which would last for approximately 17 years. The parties dispute whether they were actually a "couple" or romantically involved, but it was undisputed that they were never married. The parties moved to Tennessee in 2004, along with Ms. Whitfield's two children from a prior relationship and Ms. Compher's child from a prior relationship. Upon moving to Tennessee, the parties decided that Ms. Whitfield would be a stay-at-home parent with the

children and that Ms. Compher would support the family. In approximately 2009-2010, the parties decided to have a child together. The parties determined that Ms. Whitfield would carry the child, they would use anonymous donated sperm to conceive the child, and they would be equal parents regardless of their different biological connection to the child. The parties then contracted with Cryogenic Laboratories to obtain the sperm from an anonymous donor, and selected a fertility clinic in Tennessee to perform the actual insemination.

On March 20, 2012, Emory ("the child") was born.[1] For approximately seven years, the parties co-parented as equal parents and both held out the child as the child of both of the parties. The parties then ended their partnership in December 2018, but they attempted to live together and co-parent the child for several more months. However, Ms. Compher moved out of the home in June 2019 because the relationship between the parties had become "toxic." The parties continued to co-parent for a short time, but Ms. Whitfield later cut off the child's contact with Ms. Compher.

On February 10, 2020, Ms. Compher filed a petition to establish parentage (or de facto parentage) of and for the child. Ms. Compher sought to be recognized as a legal parent of the child based on Tennessee Code Annotated section 36-2-304(a)(4). Alternatively, she sought to be recognized as the de facto parent of the child since the child was conceived through assisted reproduction and raised by the parties in a committed relationship, where the parties shared equally in parenting and held out the child as the child of both of them. Following the filing of this petition, the juvenile court magistrate issued restraining orders pursuant to Tennessee Code Annotated section 36-6-116. Ms. Compher then filed a motion to appoint guardian ad litem and a motion for a temporary parenting schedule.

In April 2020, Ms. Whitfield filed a motion to dismiss pursuant to Tennessee Rules of Civil Procedure 12.02(6) for failure to state a claim upon which relief may be granted. Ms. Whitfield also filed responses to Ms. Compher's motions to appoint guardian ad litem and for a temporary parenting schedule. Ms. Compher then filed a motion to set a hearing and a response in opposition to the motion to dismiss.

On May 14, 2020, this Court issued its decision in *Pippin v. Pippin*, No. M2018-00376-COA-R3-CV, 2020 WL 2499633, at *1 (Tenn. Ct. App. May 14, 2020), which involved similar circumstances. In light of this decision, Ms. Compher filed a motion to stay proceedings pending resolution of the *Pippin* case because an application for appeal

---

[1] Ms. Whitfield was the only party named on the child's birth certificate. The name(s) listed on a birth certificate are not a finding of parentage nor do they create or terminate parental rights. *In re Adoption of A.F.C.*, 491 S.W.3d 316, 319 (Tenn. Ct. App. 2014). However, a birth certificate does provide "prima facie evidence of the facts stated" therein. *Id.*; *see* Tenn. Code Ann. § 68-3-202.

to the Tennessee Supreme Court was expected to be filed.[2]  However, on May 19, 2020, the juvenile court magistrate entered an order granting Ms. Whitfield's motion to dismiss the petition to establish parentage.  Following this order, Ms. Compher sought a de novo hearing before the juvenile court judge by filing a request.

In August 2020, the juvenile court entered an order denying the motion to stay proceedings and setting a hearing before the juvenile court judge.  A de novo hearing was then held in September 2020.  On April 6, 2021, the juvenile court entered an order granting Ms. Whitfield's motion to dismiss and dismissing Ms. Compher's petition.  The juvenile court found the *Pippin* decision to be "clearly controlling," holding as follows:

> From all the foregoing, the Court finds that the Court of Appeals decision in *Pippin* . . . is clearly controlling.  The *Pippin* opinion holds that a non-biological parent of a child in a long-term relationship with the biological parent, who helped raise the child from birth, and who had lived with the child, holding herself out as one of the child's parents with the support of the biological parent, lacks standing to file a petition to establish parentage.  The Court of Appeals has held that the statute under which *Pippin* and this case were brought, . . . § 36-2-304(A)(4), only covers unmarried fathers, and not mothers.  The Tennessee legislature has addressed similar matters with grandparent and step-parent visitation rights and it is in their authority to address similar issues in the future[,] but as the matter stands at present based on the statute and the law[,] a party must prove the presumption applies as a biological parent, and the only biological parent here is [Ms. Whitfield].  Further, based on the *Pippin* opinion, Tennessee law does not at this time recognize the concept of "de facto" parentage.
>
> Therefore, the Court finds that [Ms. Whitfield's] Motion to Dismiss is hereby granted, as [Ms. Compher] has no means under current Tennessee law to establish parentage and lacks standing to assert a claim.  The Court does find that this action was brought by Petitioner in good faith to change existing law and as a result, there is no basis to award attorney fees to [Ms. Whitfield] under . . . [§] 20-12-119.  The Court finds that court costs should be taxed to [Ms. Compher].

Ms. Compher timely filed her appeal on May 5, 2021.[3]  Shortly after this appeal was filed, this Court issued its decision in *Potts v. Potts*, No. M2020-00170-COA-R3-CV, 2021 WL

---

[2] Ms. Rubenfeld, counsel for Ms. Compher, was also counsel for the appellant in the *Pippin* case. Ms. Rubenfeld later filed a copy of the Rule 11 application for review from the *Pippin* case to demonstrate that an application for appeal to the Tennessee Supreme Court had been filed.

[3] Ms. Compher explains in her appellate brief that she filed this notice of appeal prior to the written opinion being entered by the juvenile court, but within 30 days of the ruling from the bench.  She then filed a second notice of appeal on May 7, 2020, after the written opinion had been entered.

2226622, at *1 (Tenn. Ct. App. June 2, 2021), which, like *Pippin*, also involved similar circumstances.

## II.    ISSUES PRESENTED

Ms. Compher presents the following issues for review on appeal, which we have slightly restated:

1. Whether *Pippin* is no longer "clearly controlling" in light of *Potts*, and Ms. Compher should be found to be a parent within the meaning of the parentage presumption statute with standing to pursue this action;
2. Whether the juvenile court's finding of no standing to pursue this parentage action should be reversed since it was grounded on constitutionally impermissible distinctions based on sex and the type of assisted reproduction utilized to conceive the child involved; and
3. If the Tennessee parentage statutory scheme does not apply, whether an unmarried adult who is not related to a child by biology or adoption, like Ms. Compher, has standing to pursue this case nonetheless as a legal or de facto parent based on Tennessee common law and the persuasive authority of other States, given the precedent set by the Tennessee Supreme Court in *In re C.K.G.*, 173 S.W.3d 714 (Tenn. 2005), particularly where, as here, that adult participated in the intentional conception of that child; helped raise the child for the first seven years of her life voluntarily and without expectation of compensation; supported the child financially and emotionally; held the child out to the world as her natural child; loved and parented the child; and the child was taught by her biological parent that the adult was her other parent.

Ms. Whitfield presents the following issues for review on appeal, which we have slightly restated:

1. Whether *Pippin* is controlling regarding standing in this matter meaning Ms. Compher has no standing to file suit against Ms. Whitfield for parentage of the child;
2. Whether *Potts* did not overrule *Pippin* as to unmarried persons, *Pippin* is still "clearly controlling," and Ms. Compher should not be found to have standing as a parent within the meaning of the parentage presumption statute to pursue this action;
3. Whether the juvenile court's holding that Ms. Compher did not have standing should be affirmed since it is not based on constitutionally impermissible distinctions and Ms. Compher is asking this Court to legislate by extending the statutory basis for parentage through assisted reproduction further than that created by the legislature;
4. Whether Tennessee does not recognize de facto parentage;
5. Whether this case should be remanded to the juvenile court for a determination of the amount of costs and attorney's fees to be paid by Ms. Compher to Ms. Whitfield

- 4 -

pursuant to Tennessee Code Annotated sections 20-12-119(c)(1) and 36-5-103(c) and other authority; and

6. Whether Ms. Whitfield should be awarded her attorney's fees on appeal and/or awarded damages for frivolous appeal.

For the following reasons, we affirm the juvenile court's decision to dismiss Ms. Compher's petition.

## III. STANDARD OF REVIEW

This is an appeal of a dismissal pursuant to Tennessee Rule of Civil Procedure 12.02(6). "The standards by which our courts should assess and dispose of a Rule 12.02(6) motion to dismiss are well-established and have been clearly and consistently applied" for several decades now. *Webb v. Nashville Area Habitat for Humanity, Inc.*, 346 S.W.3d 422, 426 (Tenn. 2011). Our Supreme Court has summarized the standard of review for a Rule 12.02(6) motion to dismiss as follows:

> A Rule 12.02(6) motion challenges only the legal sufficiency of the complaint, not the strength of the plaintiff's proof or evidence. The resolution of a 12.02(6) motion to dismiss is determined by an examination of the pleadings alone. A defendant who files a motion to dismiss "admits the truth of all of the relevant and material allegations contained in the complaint, but . . . asserts that the allegations fail to establish a cause of action."
>
> In considering a motion to dismiss, courts "must construe the complaint liberally, presuming all factual allegations to be true and giving the plaintiff the benefit of all reasonable inferences." A trial court should grant a motion to dismiss "only when it appears that the plaintiff can prove no set of facts in support of the claim that would entitle the plaintiff to relief." We review the trial court's legal conclusions regarding the adequacy of the complaint de novo.

*Lemon v. Williamson Cnty. Schs.*, 618 S.W.3d 1, 11-12 (Tenn. 2021) (quoting *Webb*, 346 S.W.3d at 426 (citations omitted)).

## IV. DISCUSSION

At the outset of this discussion, we emphasize, as our Supreme Court did nearly two decades ago, that cases such as the one at bar are commonly problematic considering that the "technological fragmentation of the procreative process, insofar as it includes techniques for egg and sperm donation and preservation, has engendered a bewildering variety of possibilities which are not easily reconciled with our traditional definitions of

- 5 -

'mother,' 'father,' and 'parent.'" *In re C.K.G.*, 173 S.W.3d at 721. At the time of our Supreme Court's decision in *In re C.K.G.* in 2005, Tennessee's parentage and related statutes did not contemplate the variety of possibilities that have been "made possible by recent developments in reproductive technology." *Id.* Still today, "the ability to create children using assisted reproductive technology has far outdistanced the legislative responses to the myriad of legal questions" that arise from assisted reproductive technology. *In re Amadi A.*, No. W2014-01281-COA-R3-JV, 2015 WL 1956247, at *10 (Tenn. Ct. App. Apr. 24, 2015) (quoting *In re Baby*, 447 S.W.3d 807, 841 (Tenn. 2014) (Koch, J. concurring)).

## A. Standing

In addressing the issue of standing, we believe it is helpful to briefly recount the development of the law in Tennessee with regard to the relevant methods of reproductive technology. Specifically, the development of both case law and statutes regarding both *in vitro* fertilization and artificial insemination.

### i. In re C.K.G.

We begin our analysis by discussing the precedent set by our Supreme Court in *In re C.K.G*, a case dealing with *in vitro* fertilization, which Ms. Compher alleges is relevant to some of the issues she has presented. The case involved a maternity dispute in which "[a]n unmarried, heterosexual couple had three children by obtaining eggs donated from an anonymous third-party female, fertilizing the eggs *in vitro* with the man's sperm, and implanting the fertilized eggs in the woman's uterus." *In re C.K.G.*, 173 S.W.3d at 716. After their relationship deteriorated, the unmarried woman filed a petition to establish parentage and to obtain custody and child support. *Id.* at 718. The man argued that the woman lacked a genetic connection to the children, failed to qualify as the children's "mother" under Tennessee's domestic relation statutes, and lacked standing as a parent. *Id.* at 718-19. On appeal, this Court "adopted the intent test . . . holding that 'this issue should be resolved by looking to the intent of the parties' and not merely to genetics." *Id.* at 719. The Tennessee Supreme Court then granted the application for permission to appeal to answer this question of first impression: "under such circumstances, who as a matter of law is the children's mother?" *Id.* at 719-20.

Our Supreme Court provided discussion on maternity disputes. *Id.* at 720. It determined from the start that its "case [was] distinguishable from maternity disputes within the context of 'traditional surrogacy'"[4] and was "closer in kind to 'gestational surrogacy with egg donation'" because an anonymous, surrogate egg donor had provided eggs to the woman who was the gestator and "who gave birth ostensibly for her own

---

[4] "Surrogacy is generally defined as 'the process of carrying and delivering a child for another person.'" *In re Baby*, 447 S.W.3d at 818 (quoting *Black's Law Dictionary* 1582 (9th ed. 2009)).

benefit." *Id.*

In its analysis, our Supreme Court discussed several relevant statutes. "Tennessee's domestic relations statutes expressly account for genetics in parentage determinations." *Id.* at 729; *see* Tenn. Code Ann. §§ 36-1-102(10) and 36-2-302(4). The Court explained that "although the definition of 'biological parents' in Tennessee Code Annotated section 36-1-102(10) implicitly accounts for assisted conception by distinguishing between physical (natural) and genetic conception, . . . the adoption and parentage statutes do not further elaborate upon this distinction." *Id.* at 723. The Court further explained that

> the parentage statutes generally fail to contemplate dispute over maternity. For example, the rebuttable presumptions of parentage provided in Tennessee Code Annotated section 36-2-304 (2001) focus exclusively on establishing paternity. *See* Tenn. Code Ann. § 36-2-304(a) ("A man is rebuttably presumed to be the father of a child if . . . .") (emphasis added). The statutes also employ the term "mother" in a way that assumes we already know who the "mother" is, *see, e.g.* Tenn. Code Ann. §§ 36-2-303, 36-2-305(b)(1)(B) (2001), whereas references to "father" include such phrases as "a man claiming to be the child's father," Tenn. Code Ann. § 36-2-305(b)(1)(C), "alleged father," Tenn. Code Ann. § 36-2-305(b)(4), and "putative father," Tenn. Code Ann. § 36-2-318 (2001). Similarly, the statute providing for an order of parentage is concerned solely with the establishment of paternity. *See* Tenn. Code Ann. § 36-2-311(a) (2001) ("Upon establishing parentage, the court shall make an order declaring the father of the child.") (emphasis added). The statutes lack corresponding language concerning the establishment of maternity.

*Id.* The Court then discussed whether it should apply "the genetics test" or "the intent test" to establish legal maternity. *Id.* at 724-26. Ultimately, the Court declined to adopt either the "genetic test" or the "intent test" and vacated the Court of Appeals decision. *Id.*

Instead, the Tennessee Supreme Court considered both genetics and intent as relevant factors, along with gestation and the nature of the controversy. *Id.* at 727-30. The Court then summarized the factors it based its decision on: (1) both parties demonstrated the intent that the woman would be the children's legal mother and agreed that she would accept the legal responsibility as well as the legal rights of parenthood; (2) the woman then became pregnant, carried to term, and gave birth to the three children as her own; and (3) there was no controversy between the gestator and the female genetic progenitor where the genetic and gestative roles had been separated and distributed among two women. *Id.* at 730. As such, the Court concluded that the woman was the children's legal mother even though she lacked a genetic connection.[5] *Id.*

---

[5] The Tennessee Supreme Court expressly limited its holding, stating: "[T]his case does not involve

In its opinion, the Court encouraged the Legislature to give direction in this area of the law, stating:

> Given the far-reaching, profoundly complex, and competing public policy considerations necessarily implicated by the present controversy, we conclude that crafting a general rule to adjudicate all controversies so implicated is more appropriately accomplished by the Tennessee General Assembly. *Cf. Taylor v. Beard,* 104 S.W.3d 507, 511 (Tenn. 2003) (declining to create a previously unrecognized common law cause of action where doing so would have "far-reaching social and legal consequences in an area that we have consistently left to legislative discretion"). The General Assembly is better suited than the courts to gather data, to investigate issues not subject to current litigation, and to debate the competing values and the costs involved in such an issue as deciding whether generally to subject procreation via technological assistance to governmental oversight, and if so, to determine what kind of regulation to impose. *Cf. Smith v. Gore,* 728 S.W.2d 738, 747 (Tenn. 1987) ("The Court simply does not function as a forum for resolution of . . . generalized public issues; rather, it must decide the legal case or controversy presented by the particular parties before it."). Even courts which have crafted and applied the intent and genetic tests have been cognizant of the need for legislative action concerning technologically assisted human reproduction. Although the courts have the power to "determine public policy in the absence of any constitutional or statutory declaration," *Alcazar v. Hayes,* 982 S.W.2d 845, 851 (Tenn. 1998)—indeed, in this case we have crafted a judicial rule, albeit a particularly narrow one which we find to be consistent with policy implicit in the Tennessee Code— for us to declare a policy of sweepingly general and administratively grave effect based on the very narrowly circumscribed data before us in this controversy would cause us to intrude upon the legislative function, *see Cavender v. Hewitt,* 145 Tenn. 471, 239 S.W. 767, 768 (1922).

*Id.* at 730-32 (footnotes omitted).

The Court decided *In re C.K.G.* in 2005. As the Court in that case acknowledged, Tennessee had a law which governed artificial insemination, but no legislation pertaining to *in vitro* fertilization. *Id.* at 728, 730-32. *See* Tennessee Code Annotated Section 68-3-306. In 2013, the General Assembly enacted Tenn. Code Ann. §§ 36-2-401 to -403.

---

a controversy between a gestator and a female genetic progenitor where the genetic and gestative roles have been separated and distributed among two women, nor does this case involve a controversy between a traditional or gestational surrogate and a genetically-unrelated intended mother; our holding today is not designed to control such controversies." *In re C.K.G.*, 173 S.W.3d at 730.

Subsequently, "we presume[d] that, in doing so, the General Assembly intended to address the issues raised by *In re C.K.G. . . . .*" *Potts*, 2021 WL 2226622, at *11.

### ii.     *Pippin*

As previously stated, this Court issued its decision in *Pippin* in May 2020. Similar to the case at bar,[6] *Pippin* was a parentage action involving a same-sex partnership, in which the petitioner filed a petition seeking to be recognized as a legal parent of a child born by *artificial insemination. Pippin*, 2020 WL 2499633, at *1. The petitioner had lived with the child and held herself out as a parent of the child. *Id.* Both parties taught the child that they were both equally his parents. *Id.* This Court began our analysis in *Pippin* with a portion devoted to the judicial doctrine of standing:

> Standing is a judicial doctrine used to determine whether a party is "entitled to have a court decide the merits of a dispute." *Am. Civil Liberties Union of Tenn. v. Darnell*, 195 S.W.3d 612, 619 (Tenn. 2006). The doctrine of standing precludes courts from adjudicating "'an action at the instance of one whose rights have not been invaded or infringed.'" *Mayhew v. Wilder*, 46 S.W.3d 760, 767 (Tenn. Ct. App. 2001) (quoting 59 AM.JUR.2D. *Parties* § 30 (1987)). More specifically, this doctrine "restricts '[t]he exercise of judicial power . . . to litigants who can show 'injury in fact' resulting from the action which they seek to have the court adjudicate.'" *In re Estate of Farmer*, No. M2013-02506-COA-R3-CV, 2014 WL 5308226, at *12 (Tenn. Ct. App. Oct. 15, 2014) (quoting *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 473, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982)). Where the person seeks to base his or her standing on a statute, he or she must show that the "'claim falls within the zone of interests protected or regulated by the statute in question.'" *State v. Harrison*, 270 S.W.3d 21, 28 (Tenn. 2008) (quoting *Wood v. Metro Gov't of Nashville & Davidson Cnty.*, 196 S.W.3d 152, 158 (Tenn. Ct. App. 2005)).

---

[6] We note that one difference between *Pippin* and the case at bar was the relationship of the parties alleged in their respective petitions. None of the parties were married, but the parties in *Pippin* had "executed a sworn Domestic Partner Affidavit to verify that they were a family, together supporting each other and both children . . . ." *Pippin*, 2020 WL 2499633, at *1. Despite the fact that same-sex marriage was not yet legal, "their commitment to each other and their family was just as strong without that legal recognition," demonstrated by the facts that the respondent was proposed to by the petitioner and later legally changed her surname to the petitioner's. *Id.* In this case, Ms. Compher's petition only alleged that the parties were in "a committed personal relationship and domestic partnership." Ms. Whitfield notes in her appellate brief that there was no allegation that a domestic partnership contract or affidavit was entered into by the parties. Moreover, she notes that the petition never alleged the parties were a "same-sex couple" or their relationship was "a romantic one." As such, she contends that "this is not a situation where a same-sex romantic couple is being disparately treated with respect to an opposite[-]sex couple on the basis of gender."

*Id.* at *5. This Court then discussed two relevant statutes: Tennessee Code Annotated sections 68-3-306 and 36-2-304. *Id.* at *6-7.

Section 68-3-306 is known as the artificial insemination statute, which provides that "[a] child born to a married woman as a result of artificial insemination, with consent of the married woman's husband, is deemed to be the legitimate child of the husband and wife." Tenn. Code Ann. § 68-3-306. The Court opined from a reading of this statute that "section 306 does not create the relationship that [the petitioner] advocates or confer any rights of parentage; the 'marriage-neutral' construction [the petitioner] urges is a strained interpretation of the natural and ordinary meaning of the statutory language." *Pippin*, 2020 WL 2499633, at *6. Yet the Court found that "[e]ven if section 68-3-306 were construed to create a right of visitation on the part of the husband of a woman who has given birth to a child by artificial insemination, that right would be predicated upon the child being born to a married woman." *Id.* Because the parties were not married at the time of the child's birth or any time afterward, we concluded that section 68-3-306 did not provide the petitioner with standing. *Id.*

Section 36-2-304 is known as the presumption of parentage statute, which provides in part as follows:

(a) A man is rebuttably presumed to be the father of a child if:

(1) The man and the child's mother are married or have been married to each other and the child is born during the marriage or within three hundred (300) days after the marriage is terminated by death, annulment, declaration of invalidity, or divorce;

(2) Before the child's birth, the man and the mother have attempted to marry each other in compliance with the law, although the attempted marriage is or could be declared illegal, void and voidable;

(3) After the child's birth, the man and the mother have married or attempted to marry each other in compliance with the law although such marriage is or could be declared illegal, void, or voidable; and:

(A) The man has acknowledged his paternity of the child in a writing filed under the putative father registry established by the department of children services, pursuant to § 36-2-318;

(B) The man has consented in writing to be named the child's father on the birth certificate; or

(C) The man is obligated to support the child under a written voluntary

promise or by court order;

(4) While the child is under the age of majority, the man receives the child into the man's home and openly holds the child out as the man's natural child; or

(5) Genetic tests have been administered as provided in § 24-7-112, an exclusion has not occurred, and the test results show a statistical probability of parentage of ninety-five percent (95%) or greater.

Tenn. Code Ann. § 36-2-304(a)(1)-(5).

The petitioner in *Pippin* argued that feminine words should be substituted for the masculine words in this statute, and therefore she would have standing to pursue her action. *Pippin*, 2020 WL 2499633, at *6. She relied on Tennessee Code Annotated section 1-3-104, "[w]ords importing the masculine gender include the feminine and neuter, except when the contrary intention is manifest." Tenn. Code Ann. § 1-3-104(b). The Court did not agree that recourse to section 1-3-104 was "required or necessary to resolve the issue presented." *Pippin*, 2020 WL 2499633, at *6. The Court held that "to substitute 'comparable feminine terms' for the words like 'man' or 'father,' . . . goes beyond allowing words written in one gender [to] be construed, where necessary, to apply to the other, and exceed[s] the purpose of the parentage statute . . . ." *Id.*; *see Sneed v. Henderson*, 366 S.W.2d 758, 759 (Tenn. 1963) (allowing suit to proceed for the wrongful death of an infant's mother, where wrongful death statute provided that action would pass "to his children or to his next of kin" but "applie[d] equally whether the deceased injured party be male or female"). Additionally, the Court explained that "[n]o rights or relationships are created by the parentage statutes, only a procedure by which the father is able to establish parentage . . . ." *Id.* As such, recourse to section 1-3-104(b) for other purposes was not warranted. *Id.* We also found that we could not give a gender-neutral meaning to the term "father," which was defined in section 36-2-302 by the Legislature, for purposes of section 36-2-304. *Id.* at *7. "[T]o do so would extend both statutes' meanings beyond that set forth in the chapter." *Id.* Because "the statutes governing parentage contemplate a biological or genetic connection between the child and the putative parent," we concluded that the petitioner could not fit this definition. *Id.*

As a final matter under the issue of standing, we addressed the petitioner's argument that she would have standing if the Court established her as the de facto parent of the child. *Id.* However, we stated that "[a]dherence to precedent prevents us from adopting such an approach; prior cases have expressly declined to adopt the 'de facto' parent definition of parentage for the purposes at hand." *Id.*; *see In re Thompson*, 11 S.W.3d 913, 918-19, 923 (Tenn. Ct. App. 1999); *In re Hayden C.G-J.*, No. M2012-02701-COA-R3-CV, 2013 WL 6040348, at *1 (Tenn. Ct. App. Nov. 12, 2013). We noted that "significant changes in the legal landscape regarding the recognition of same-sex marriage have taken place since *In*

- 11 -

*re Hayden C.G-J.* was decided," but "the holding in that case remains applicable to the facts of this case because the parties were unmarried." *Id.* at *8 (footnote omitted). Accordingly, we concluded that the petitioner lacked standing because she did not fall within the zones of interests protected by the parentage statutes. *Id.*

### iii.    *Potts*

Approximately one year later, this Court issued its decision in *Potts*. Although the case involved some similar circumstances, there are important distinctions between the two cases. *Potts* was a request for relief from a permanent parenting plan involving a same-sex couple who married shortly after the conception of the subject children and then divorced. *Potts*, 2021 WL 2226622, at *1. Additionally, in contrast to *Pippin* and the case at bar, the children were conceived by *in vitro* fertilization. *Id.* (emphasis added). Because Tennessee Code Annotated section 36-2-401 to -403 specifically considered *in vitro* fertilization, we focused our analysis on those statutes. *Id.* at *9.

We found from a reading of these statutes that "the legislature clearly expressed its intent that contract principles—not biology—would control the question of parentage." *Id.* at *11. We explained that, under section 36-2-403, the status as the biological parent does not place an individual in a superior position to that of the defendant who lacked a biological connection to the children. *Id.* "Rather, because both parties in this case contractually agreed to accept legal responsibility for the embryos and any children born as a result, they are on equal footing as the parents of the children." *Id.* Thus, this Court held that the defendant was a parent of the children. *Id.* at *12.

Significantly, the Court in *Potts* concluded its decision with the following paragraph:

> In years past, parental rights were premised on the parties' biological relationship to the children and the parties' marital status at the time of the children's birth. *See State ex rel. Cihlar v. Crawford*, 39 S.W.3d 172, 181-83 (Tenn. Ct. App. 2000). This was based on society's past understanding of "family" as the traditional nuclear family—"a married heterosexual couple and their children, if any." *In re Bernard T.*, 319 S.W.3d 586, 597 (Tenn. 2010). But, the traditional nuclear family is no longer the typical American family. *Id.* With increased rates of divorce, non-marital childbearing, and same-sex marriage—and advances in reproductive technology—our society's understanding of what constitutes a family has changed, and the legal definition of "parent" has slowly changed with it, as it must. *See id.* at 597-98.

*Potts*, 2021 WL 2226622, at *12. Despite this language, the Court in *Potts* distinguished its case from the Court's decision in *Pippin* in footnote 11 of its opinion, explaining that:

- 12 -

[T]he legislature expressed its intent that the marital status of the parties would not be relevant when establishing parentage in accordance with the embryo transfer statutes. This is not the case with Tennessee's artificial insemination statute, Tenn. Code Ann. § 68-3-306, which requires that the parties be married at the time of the child's birth. *See In re C.K.G.*, 173 S.W.3d at 728. As such, the artificial insemination statute has been problematic for same-sex couples who conceived children through artificial insemination prior to the *Obergefell* decision legally recognizing same-sex marriage. The same-sex couple in *Pippin*, for example, conceived a child through an artificial insemination procedure when the law in Tennessee limited marriage to opposite-sex couples. 2020 WL 2499633, at *12. The dissent argued that there was no difference between the plaintiff "and the 'husband' in Tenn. Code Ann. § 68-3-306 except for a marriage that the State of Tennessee would not allow" due to the State's unconstitutional law forbidding same-sex marriage. *Id.* at *12. Because the embryo transfer statutes are gender neutral and do not reference the marital status of the parties, we need not consider the effect of *Obergefell* in this case.

*Id.* at *11 n.11.

For part of her first issue, Ms. Compher argues that *Pippin* is no longer "clearly controlling" in light of this Court's decision in *Potts*. However, from a reading of the plain language used in our decision, we disagree. Since *Potts* did not overrule *Pippin*, *Pippin* is still persuasive, if not "clearly controlling," in this case.[7]

### iv. Harrison

In a subsequent case, this Court reached a different result than *Pippin* concerning a same-sex couple and the artificial insemination statute because the parties in that case were legally married. *Harrison v. Harrison*, No. M2020-01140-COA-R3-CV, 2021 WL 4807239, at *6 (Tenn. Ct. App. Oct. 15, 2021). The Court stated that "section 68-3-306 applies in gender-neutral manner to [the nonbiological parent] who was [the biological parent's] wife during the artificial inseminations." *Id.* Therefore, the Court held that "both

---

[7] Counsel for Ms. Compher asserted during oral argument that because *Pippin* was not a reported decision, it was not controlling but persuasive. Tenn. S.Ct. R. 4(g) (Unless certain exceptions apply, "unpublished opinions . . . shall be considered persuasive authority."). "[I]t is true that unpublished opinions are not controlling," but "Tenn. S.Ct. Rule 4(G) specifically states that unpublished cases constitute persuasive authority." *Edwards v. City of Memphis*, 342 S.W. 12, 17-18 (Tenn. Ct. App. 2010). She also asserted that there were "significant errors" in the *Pippin* decision; however, we note that the Tennessee Supreme Court declined to hear the case upon a Rule 11 application for review. Further, all the issues presented for review in this case by Ms. Compher are substantively identical to issues raised in the Rule 11 application which was filed in the *Pippin* case. Thus, while we are not bound to the decision in *Pippin*, we deem it appropriate to rely on the holding in that case as persuasive authority.

- 13 -

children born to [the biological parent] via artificial insemination during her marriage to [the nonbiological parent] are 'deemed' to be [the nonbiological parent's] 'legitimate children.'" *Id.* (footnote omitted). The Court distinguished its conclusion from *Pippin* noting that the parties in its case were married, whereas the parties in *Pippin* were not. *Id.* at *6 n.7; *see also Pavan v. Smith*, --- U.S. ----, 137 S.Ct. 2075, 2078, 198 L.Ed.2d 636 (2017) (analyzing a similar artificial insemination statute from Arkansas). This further supports our conclusion that *Potts* did not overrule *Pippin*.

### v.     Analysis

Like *Pippin*, the parties here were never married. Furthermore, there is neither an allegation that they intended to marry before or after *Obergefell* nor an allegation that they were a "couple" or romantically involved. Ms. Compher's petition only alleged that they were in "a committed personal relationship and domestic partnership." Under the holding in *Pippin*, Ms. Compher would lack standing to pursue this action because her rights are not "predicated upon the child being born to a married woman." *Pippin*, 2020 WL 2499633, at *6. Ms. Compher does not even present an issue on appeal suggesting that she would have standing under the artificial insemination statute, perhaps in recognition of the fact that the parties were never married or never attempted to marry.[8] Instead, she relies on the presumption of parentage statute in Tennessee Code Annotated section 36-2-304.

In light of this Court's decision in *Potts*, Ms. Compher argues that she should be found to be a parent within the meaning of the presumption of parentage statute (Tennessee Code Annotated section 36-2-304) with standing to pursue this action. Given that we have previously found that *Potts* did not overrule *Pippin* and that the facts of this case are nearly identical to those in *Pippin*, we disagree. To reiterate, this Court held in *Pippin* that "to substitute 'comparable feminine terms' for the words like 'man' or 'father,' . . . goes beyond allowing words written in one gender be construed, where necessary, to apply to the other, and exceed[s] the purpose of the parentage statute as stated in section 36-2-201 . . . ." *Id.* The Court determined that it could not give a gender-neutral meaning to the term "father," which was defined in section 36-2-302 by the Legislature, for purposes of section 36-2-304. *Id.* at *7. "[T]o do so would extend both statutes' meanings beyond that set forth in the chapter." *Id.* Therefore, we concluded that the petitioner could not fit this definition because "the statutes governing parentage contemplate a biological or genetic connection between the child and the putative parent." *Id.*

Ms. Compher further argues in her reply brief that only one of the five means for an unmarried man to establish parentage under the presumption of parentage statute relies on a biological connection; however, she ignores the definition section that must be read in conjunction with this statute. *See* Tenn. Code Ann. § 36-2-302. The Legislature consistently uses the descriptor "biological" in section 36-2-302, which provides

---

[8] Ms. Compher only briefly raises an argument in a footnote in her appellate brief.

- 14 -

definitions for "Father," "Mother," and "Parent." The statute provides that a "'[c]hild born out of wedlock' means a child born to *parents* who are not married to each other when the child was born," and "Parent" is defined as "the *biological* mother or *biological* father of a child, regardless of the marital status of the mother and father[.]" Tenn. Code Ann. § 36-2-302(1) and (5) (emphasis added); *see also* Tenn. Code Ann. § 36-1-102(10) (Under the adoption statute, "[b]iological parents" is defined as "the woman and man who physically or genetically conceived the child . . . ."). As such, if we were to give a gender-neutral meaning to the term "father" for purposes of section 36-2-304, we "would extend both statutes' meanings beyond that set forth in the chapter." *Pippin*, 2020 WL 2499633, at *7.

We reiterate the Court's explanation in *Pippin* regarding the purpose of Tennessee Code Annotated section 36-2-304: the presumption of parentage statute is "only a procedure by which the father is able to establish parentage . . . ." *Pippin*, 2020 WL 2499633, at *6. Our Supreme Court has explained that section 36-2-304 "focus[es] exclusively on establishing *paternity*." *In re C.K.G.*, 173 S.W.3d at 723 (emphasis added). The Court echoed this point in a subsequent case stating, "the very point of the parentage statutes is to determine the biological father of a child."[9] *In re T.K.Y.*, 205 S.W.3d 343, 350 (Tenn. 2006). Therefore, the presumption of parentage statute does not apply here because it is a procedure by which the father is able to establish parentage. Moreover, the statute contemplates a biological or genetic connection between the child and the putative parent, which was a connection Ms. Compher did not have to this child. We find that Ms. Compher did not have standing to pursue this action pursuant to the presumption of parentage statute found at Tennessee Code Annotated section 36-2-304.

### B. De Facto Parentage

Ms. Compher also presents an issue regarding de facto parentage. She contends that even if we find that the presumption of parentage statute does not apply here, she should still be declared to be a legal parent or a de facto parent based on Tennessee common law and basic equitable principles.

As explained earlier, this Court also addressed this issue in *Pippin*. "Adherence to precedent prevents us from adopting such an approach; prior cases have expressly declined to adopt the 'de facto' parent definition of parentage for the purposes at hand." *Pippin*, 2020 WL 2499633, at *7; *see In re Thompson*, 11 S.W.3d at 918-19, 923; *In re Hayden C.G-J.*, 2013 WL 6040348, at *1. "[I]n light of the Legislature's decision to not change the definition of parent or legal parent, the petitioner's arguments that she had standing under the concepts of in loco parentis and/or de facto parent . . . 'lack[ed] a legal foundation.'" *Id.* at *8 (quoting *In re Hayden C.G-J.*, 2013 WL 6040348, at *1, *4). "Although significant changes in the legal landscape regarding the recognition of same-

---

[9] Conversely, "[u]nlike the parentage statute, the adoption and termination statutes are not concerned solely with identifying a child's biological father." *In re T.K.Y.*, 205 S.W.3d at 351.

sex marriage have taken place since *In re Hayden C.G-J.* was decided, the holding in that case remains applicable to the facts of this case because the parties were unmarried." *Id.* (footnote omitted). As such, we concluded that the petitioner lacked standing because she did not fall within the zones of interests protected by the parentage statutes. *Id.*

Just as we concluded for the first issue, *Potts* did not overrule *Pippin*, and therefore the holding in *Pippin* is applicable to this case. Like *Pippin*, we again decline to adopt the concept of de facto parentage and conclude that Ms. Compher did not have standing to pursue this action under this concept.

### C. Constitutionally Impermissible Distinctions

Ms. Compher presents an additional issue regarding constitutionally impermissible distinctions. She argues that the juvenile court's finding of no standing should be reversed since it is based on constitutionally impermissible distinctions based on sex and the type of assisted reproduction utilized to create the subject child, i.e., artificial insemination.

Ms. Compher contends that there is no such "important governmental objective" to justify different treatment of men and women under a statutory provision that is not based on biology or marriage. However, as explained before, we have established that the presumption of parentage statute contemplates a biological connection between the child and the putative parent. The presumption of parentage statute is based on biology because it concerns "the matter of rights of biological fathers to establish parentage of their children." *State ex rel. Cihlar*, 39 S.W.3d at 183. For example, in a past case, a man sought "to obtain a judicial declaration that he was the father of a child whose mother was married to another man when the child was born." *Id.* at 175. As we explained in that case, the General Assembly has recognized several rebuttable presumptions under the presumption of parentage statute:

> Two of these presumptions are the presumption of parentage arising from a man's marriage to a child's mother at the time of conception, *see* Tenn. Code Ann. § 36-2-304(a)(1), and the presumption of parentage arising from a genetic test showing a statistical probability of 95% or more that a particular man is a child's biological father. *See* Tenn. Code Ann. § 36-2-304(a)(5). In addition, Tenn. Code Ann. § 36-2-305(b)(1)(C) permits any man claiming to be a child's father to file suit to establish parentage without reference to the marital status of the child's mother.

*Id.* at 184 (footnote omitted).

Ms. Compher cannot rely on or overcome the presumptions in this statute because it is clear that she is not biologically or genetically connected to the child. Although Ms. Compher may be connected to this child in some significant ways, biology or genetics is

- 16 -

not one of them. Consequently, Tennessee Code Annotated section 36-2-304 is inapplicable to her situation. Because the presumption of parentage statute contemplates this biological connection, we conclude that the juvenile court's finding should not be reversed on this basis.

Ms. Compher also argues that there is no functional difference between a child conceived by embryo transfer and a child conceived by artificial insemination. Therefore, she argues that the holdings in *Pippin* and *Potts* conflict by treating children and the people who raise them in different manners for purposes of determining parentage. The Court found in *Pippin* that the Legislature intended for the applicability of the artificial insemination statute in Tennessee Code Annotated section 68-3-306 to "be predicated upon the child being born to a married woman." *Pippin*, 2020 WL 2499633, at *6. In contrast, the Court found in *Potts* that the Legislature intended for the applicability of the *in vitro* fertilization statute in Tennessee Code Annotated section 36-2-403 to be predicated on "contract principles" and "not biology." *Potts*, 2021 WL 2226622, at *11. As such, the artificial insemination statute is grounded upon marriage, while the *in vitro* fertilization is grounded upon contract principles.

Our Supreme Court has explained that "[t]he General Assembly is better suited than the courts . . . in such an issue as deciding whether generally to subject procreation via technological assistance to governmental oversight, and if so, to determine what kind of regulation to impose." *In re C.K.G.*, 173 S.W.3d at 731; *cf. Smith v. Gore*, 728 S.W.2d 738, 747 (Tenn. 1987) ("The Court simply does not function as a forum for resolution of . . . generalized public issues; rather, it must decide the legal case or controversy presented by the particular parties before it."). *Why* there is such a distinction between these two types of technologically-assisted procreation is a question we are neither equipped nor inclined to answer. This Court is not permitted "to question the wisdom of the statutory scheme." *Pickard v. Tenn. Water Quality Control Bd.*, 424 S.W.3d 511, 524 (Tenn. 2013) (quoting *Green v. Johnson*, 249 S.W.3d 313, 318 (Tenn. 2008)); *see also* Tenn. Const. art. II, § 2. Instead, our purpose is "to interpret and apply the law." *Groves v. Ernst-Western Corp.*, No. M2016-01529-COA-T10B-CV, 2016 WL 5181687, at *6 (Tenn. Ct. App. Sept. 16, 2016) (citing *Colonial Pipeline Co. v. Morgan*, 263 S.W.3d 827, 843 n.8 (Tenn. 2008)). While "the courts have the power to 'determine public policy in the absence of any constitutional or statutory declaration,'" we decline to do so here where the statutory language and the case law supports the conclusion we have reached. *In re C.K.G.*, 173 S.W.3d at 731-32.

Based on the language of Tennessee Code Annotated section 68-3-306, the statute is grounded upon a child being born in the context of marriage. *In re C.K.G.*, 173 S.W.3d at 728. "Tennessee's artificial insemination statute provides married couples who pursue artificial insemination a form of legal recognition by deeming the child born during their marriage to be their 'legitimate child.'" *Harrison*, 2021 WL 4807239, at *5. Here, the parties were in a same-sex domestic partnership and chose to have a child by artificial

insemination, but they were not married nor did they choose to marry any time after the United States Supreme Court's decision in *Obergefell* legalized same-sex marriage. Ms. Whitfield is the individual who gave birth to the child and who is biologically and genetically connected to the child. While Ms. Whitfield had Ms. Compher's consent to proceed with the artificial insemination, they were not married, which the artificial insemination statute is predicated upon. Therefore, we conclude that the juvenile court's finding should be affirmed.

### D. Attorney's Fees

#### i. Tennessee Code Annotated section 20-12-119

The juvenile court declined to award attorney's fees under Tennessee Code Annotated section 20-12-119 finding that this action was brought in good faith to challenge existing law. Ms. Whitfield argues that this case should be remanded to the juvenile court for a determination of the amount of costs and attorney's fees to be paid by Ms. Compher pursuant to Tennessee Code Annotated section 20-12-119(c)(1). Ms. Compher asserts that section 20-12-119(c) provides an exception for cases such as this one: a good faith challenge to modify and correct existing precedents. Thus, she argues that this case was a good faith, non-frivolous effort for the purpose of modifying the impact of prior Tennessee intermediate appellate decisions based on changes in the law. We agree with the juvenile court and Ms. Compher on this issue. Section 20-12-119(c)(1) provides as follows:

> (c)(1) Notwithstanding subsection (a) or (b), in a civil proceeding, where a trial court grants a motion to dismiss pursuant to Rule 12 of the Tennessee Rules of Civil Procedure for failure to state a claim upon which relief may be granted, the court shall award the party . . . against whom the dismissed claims were pending at the time the successful motion to dismiss was granted the costs and reasonable and necessary attorney's fees incurred in the proceedings as a consequence of the dismissed claims by that party or parties. The awarded costs and fees shall be paid by the party . . . whose claim or claims were dismissed as a result of the granted motion to dismiss.

Tenn. Code Ann. § 20-12-119(c)(1). Additionally, section 20-12-119(c)(5)(E) provides that subsection (c) shall not apply when:

> (E) Any claim which is a good faith, nonfrivolous claim filed for the express purpose of extending, modifying, or reversing existing precedent, law or regulation, or for the express purpose of establishing the meaning, lawfulness or constitutionality of a law, regulation or United States or Tennessee constitutional right where the meaning, lawfulness or constitutionality is a matter of first impression that has not been established by precedent in a published opinion by the Tennessee supreme court, court of appeals, court of

criminal appeals, a United States district court in Tennessee, or by the United States supreme court. This subdivision (c)(5)(E) shall not apply unless at the time the successful motion to dismiss was filed the party that made the dismissed claim had specially pleaded in its latest complaint, counter-complaint or cross-complaint that the dismissed claim was made for one (1) of the express purposes listed above and cited the contrary precedent or interpretation the party seeks to distinguish or overcome, or whether the issue to be decided is a matter of first impression as described in this subdivision (c)(5)(E)[.]

Tenn. Code Ann. § 20-12-119(c)(5)(E). At the very least, Ms. Compher's petition sought to extend existing precedent to recognize de facto parentage in Tennessee and cited decisions from other jurisdictions to support her argument. Additionally, her petition was filed before this Court issued its decision in either the *Pippin* or the *Potts* case. Therefore, we decline to remand this case to the juvenile court for a determination of the amount of costs and attorney's fees pursuant to Tennessee Code Annotated sections 20-12-119(c)(1).

### ii.    Tennessee Code Annotated section 36-5-103

Ms. Whitfield also argued that this case should be remanded to the juvenile court for a determination of the amount of costs and attorney's fees to be paid by Ms. Compher under Tennessee Code Annotated section 36-5-103(c). Section 36-5-103(c) provides as follows:

(c) A prevailing party may recover reasonable attorney's fees, . . . from the nonprevailing party in any . . . proceeding to enforce, alter, change, or modify any decree of alimony, child support, or provision of a permanent parenting plan order, or in any suit or action concerning the adjudication of the custody or change of custody of any children, *both upon the original divorce hearing and at any subsequent hearing*.

Tenn. Code Ann. § 36-5-103(c) (emphasis added). This statute "has been broadly interpreted in many ways." *St. John-Parker v. Parker*, 638 S.W.3d 624, 638 (Tenn. Ct. App. 2020); *see e.g.*, *Toms v. Toms*, 98 S.W.3d 140, 145 (Tenn. 2003) (interpreting the statute to authorize awards of attorney fees against intervening grandparents who were not a "spouse"); *Dale v. Dale*, No. M2018-01999-COA-R3-CV, 2019 WL 7116204, at *2 (Tenn. Ct. App. Dec. 20, 2019) ("This provision has been construed broadly to permit the award of attorney's fees in corollary matters, such as actions to modify visitation rights."); *Muhlstadt v. Muhlstadt*, No. M2012-01267-COA-R3-CV, 2013 WL 3833563, at *6 (Tenn. Ct. App. July 19, 2013) ("This statute has been interpreted by the courts as allowing for the award of attorney's fees to a party defending an action to change a prior order on the theory that the defending party is enforcing the prior order.") (quotation omitted); *Brewster v. Galloway*, No. E2011-01455-COA-R3-CV, 2012 WL 2849428, at *12 (Tenn. Ct. App.

July 11, 2012) (recognizing that the statute has been applied to parties who were never "spouses" but had children born out of wedlock); *Pounders v. Pounders*, No. W2010-01510-COA-R3-CV, 2011 WL 3849493, at *5 (Tenn. Ct. App. Aug. 31, 2011) (finding "no support for Father's narrow interpretation of the statute" and awarding attorney's fees even though the petition was voluntarily dismissed prior to adjudication); *Evans v. Evans*, No. M2002-02947-COA-R3-CV, 2004 WL 1882586, at *13 (Tenn. Ct. App. Aug. 23, 2004) ("[T]he broad interpretation given the statute, based upon its incorporation of the common law, in the context of child support orders should also apply to spousal support orders."). Even assuming, *arguendo*, that section 36-5-103(c) allows Ms. Whitfield to recover attorney's fees under these circumstances,[10] such an award is still within the sound discretion of this Court. *In re C.W.*, 420 S.W.3d 13, 22 (Tenn. Ct. App. 2013) (citing *Archer v. Archer*, 907 S.W.2d 412, 419 (Tenn. Ct. App. 1995)). Exercising our discretion, we decline to award Ms. Whitfield attorney's fees pursuant to Tennessee Code Annotated section 36-5-103(c).

### iii. Tennessee Code Annotated section 27-1-122

Alternatively, Ms. Whitfield seeks an award for damages on appeal for a frivolous appeal. Tennessee Code Annotated section 27-1-122 provides as follows:

> When it appears to any reviewing court that the appeal from any court of record was frivolous or taken solely for delay, the court may, either upon motion of a party or of its own motion, award just damages against the appellant, which may include, but need not be limited to, costs, interest on the judgment, and expenses incurred by the appellee as a result of the appeal.

Tenn. Code Ann. § 27-1-122. "Determining whether to award damages pursuant to Tennessee Code Annotated section 27-1-122 'is a discretionary decision.'" *Cored, LLC v. Hatcher*, No. M2020-00083-COA-R3-CV, 2020 WL 5944067, at *11 (Tenn. Ct. App. Oct. 6, 2020) (quoting *Young v. Barrow*, 130 S.W.3d 59, 66-67 (Tenn. Ct. App. 2003)). "A frivolous appeal is one that is 'devoid of merit' or 'has no reasonable chance of succeeding.'" *Id.* (quoting *Young*, 130 S.W.3d at 67). Although Ms. Compher was not successful on appeal, we cannot say that the appeal was "totally devoid of merit." As such, we decline to award Ms. Whitfield damages pursuant to Tennessee Code Annotated section 27-1-122.

## V. CONCLUSION

---

[10] We make no determination concerning whether Tennessee Code Annotated section would allow Ms. Whitfield to recover her attorney's fees under the circumstances of this case. *See In re Ryat M.*, No. M2020-00156-COA-R3-JV, 2021 WL 4432729, at *7 n.7 (Tenn. Ct. App. Sept. 27, 2021) ("We make no determination concerning whether Tennessee Code Annotated section 36-5-103(c) would allow the Grandparents to recover their attorney's fees in this case.").

- 20 -

For the aforementioned reasons, we affirm the decision of the juvenile court. Costs of this appeal are taxed to the appellant, Christina Jane Compher, for which execution may issue if necessary.

_____
CARMA DENNIS MCGEE, JUDGE